UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DAVID M. CIAMPI,<br>Plaintiff,<br><br>v.<br><br>ETSUKO MOTOKI ZUCZEK, in her capacity as Finance Director of the Town of Westerly; PAUL CORINA, in his capacity as Superintendent of Water of the Town of Westerly, and PETER CHIARADIO, in his capacity as Superintendent of Public Works of the Town of Westerly,<br>Defendants | C.A. NO. 07-256 S |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This case arises from the two alleged intrusions on Plaintiff's property at 486 Atlantic Avenue. The first is the existence of a drainage ditch allowing storm water and tidal water to drain from the roadway onto Plaintiff's property. The second intrusion is a subterranean pipe providing water service to abutting homes which runs through the Plaintiff's property. The summary judgment record establishes, however, that the Town of Westerly cannot be held liable.[1] The drainage ditch which enters Plaintiff's property has been in existence over 40 years, and the Town's open, notorious and continuous maintenance created a prescriptive easement in continued use. The Town did not own, install or maintain the water service line across Plaintiff's property, precluding liability. Furthermore, Plaintiff cannot recover for a taking that occurred prior to his ownership, nor do the

---

[1] Plaintiff's Amended Complaint names three individual Town officials, all of whom are sued in their capacity as Town officials only, and referred to collectively in the complaint as the "Town." See Pl.'s Amend. Compl. ¶¶ 2-4. As stated by the U.S. Supreme Court, "[s]uits against state officials in their official capacity ... should be treated as suits against the State." Hafer v. Melo, 502 U.S. 21, 25 (1991). Even had they been sued individually, they would be entitled to Qualified Immunity from liability. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

facts of this case support claims for violations of procedural or substantive due process.

## II. FACTS

Pursuant to Local Rule 56, the Defendant has submitted the accompanying Concise Statement of Material Facts as to which there is No Genuine Issue to be Tried, which is incorporated here by reference. Plaintiff David Ciampi is the present owner of a parcel of property known as 486 Atlantic Avenue, Westerly RI, that is the subject of this Complaint. See Pl.'s Amend. Compl. ¶ 1. Due to its proximity to Block Island Sound and Winnapaug Pond, Atlantic Avenue is susceptible to periodic flooding during rain storms. See J. Henry Depo. pp. 129-130. The area in the vicinity of the property is a barrier beach between the Atlantic Ocean and Winnapaug Pond. See Pl.'s Depo. pp. 29-30. Plaintiff's property is across the street from the ocean-front homes (to the south), and about 100 feet from Winnapaug Pond (to the north). See Pl.'s Depo. pp. 49-50, 197. The pond is a large tidal salt water pond approximately 1½ miles long and 1/4 mile wide. See T. McGrath Depo. p. 9. During rainfalls or storm surges there is periodic flooding and pooling of water along Atlantic Avenue in the vicinity of Plaintiff's address, and abutting properties are regularly surrounded by water. See J. Henry Depo. pp. 15-16; 21-22; 24-25; 44; see also F. Dubreuil Depo. p. 14-16.

Plaintiff made an offer to purchase the parcel, negotiated the purchase price to $90,000, and made a deposit payment of between $500-$1000, within a week or two of first visiting the property in August 2000 . See Pl.'s Depo. pp. 34-35, 48-49. The parcel size is approximately 70 feet by 150 feet and it lies within a flood plain. See Pl.'s Depo. pp. 35-36; 42-43. At the time of the purchase agreement, the property was a flat, vacant lot, overgrown with brush and poison ivy, with the brush being about waist high. See Pl.'s Depo. p. 35. Because of the location of the property, a Coastal Resources Management Council ("CRMC") permitting process is required prior to commencing development. See Pl.'s Depo. p. 52-53; see also R.I. Gen.L. §§ 46-23-2, 46-23-6 (stating powers and

duties of CRMC. including authority over land areas). To build on the lot Plaintiff also required state approval from the Department of Environmental Management for the septic system. See Pl.'s Depo. p. 53. The time from the initial purchase contract until the property was conveyed was about 3 years. See A. Turco Depo. pp. 26-27. The purchase of the property did not close until December 2003. See Trustee's Deed dtd. 12/17/2003 and accompanying HUD Settlement Stmt.

Plaintiff became aware of the existence of a drainage ditch on the property within approximately two months of agreeing to purchase it, when so informed by his engineer Eugene Spring. See Pl.'s Depo. pp. 60-61. At that time the drainage swale "was draining water from Atlantic Avenue onto the property." See Pl.'s Depo. p. 60. The ditch was a "V" shaped swale about 2 feet wide and 1½ feet deep sloping away from the street. See Pl.'s Depo. p. 63; see also Three photocopies of Polaroid Photographs (depicting drainage swale as it appeared in November 2001). The ditch runs approximately 125 feet perpendicular to Atlantic Avenue. See Plan of Land dtd. 4/12/01 (depicting location of the ditch). The ditch is not even on Plaintiff's property at first, starting on his neighbor McGrath's property, and only entering onto Plaintiff's property after about 60 feet, thereafter it drains into an "isolated wetland" area upon Plaintiff's property. See Plan of Land dtd. 4/12/01; see also Pl.'s Depo. pp. 64-65.

The drainage swale has been in existence at least since the 1960's. Plaintiff's neighbor, Jefferson Henry, recalled the ditch existed during his childhood during the 1970's, when he crunched the ice that formed on the ditch in the winter. See J. Henry Depo. pp. 35-36; 106. Another neighbor, Francis Dubreuil, stated the ditch had been there since the early 1960's to drain water from the roadway. See F. Dubreuil Depo. pp. 30-31. Mr. Dubreuil agreed that the drainage ditch was obvious to anyone who walked by and there was nothing hidden about it, except it was occasionally overgrown with grass. See F. Dubreuil Depo. pp. 86-87. Mr. Dubreuil saw Town workers clearing

the drainage in the Spring of every year. See F. Dubreuil Depo. p. 33.

Wayne Palumbo, the Assistant Superintendent of the Town Highway Department, was familiar with Plaintiff's property at 486 Atlantic Avenue and had cleaned the "trough" out since he started employment in 1978, using shovels and a square spade, and never using mechanical equipment. See W. Palumbo Depo. pp. 4, 11-13, 15-17. Mr. Palumbo did not know when the drainage ditch first came into existence. See W. Palumbo Depo. pp. 35-36. Mr. Palumbo kept a list of waterways and troughs maintained by the Town, which maintenance continues to the present day, and he was unaware of whether any easements existed for such work. See W. Palumbo Depo. pp. 20-21, 27. Mr. Palumbo said this type of work on Plaintiff's property was scheduled once a year in the summer months, and this continued until at least the year 2000. See W. Palumbo Depo. pp. 14, 16. The work consisted of removing sediment and runoff, and the Town did not alter the depth or the width of the drainage ditch when doing the maintenance at any time from 1978 to 2000. See W. Palumbo Depo. p. 35. Mr. Frank Antorch, a former Assistant Superintendent of the Highway Department, was familiar with the area of Plaintiff's property and would occasionally go onto the property to clear the mouth of the trench from weeds and overgrowth to release water from the roadway for safety purposes. See F. Antorch Depo. pp. 4, 11-13. Mr. Antorch did this maintenance once a year or as needed. See F. Antorch Depo. p. 14. Mr. Antorch did not know who owned the property nor did he seek permission from the owners for the maintenance. See F. Antorch Depo. pp. 15-16.

Former Superintendent of Public Works John Fusaro testified that in the early 1990's he had work crews "cut swaleways" with hand shovels to alleviate a flooding problem that plagued Atlantic

Avenue in an attempt to alleviate a safety issue created by flooding.[2] See J. Fusaro Depo. pp. 14-16, 17-18. Mr. Fusaro did not seek the owners permission, nor get state approval for the swale-way work. See J. Fusaro Depo. pp. 15, 19, 23. As it relates to the maintenance of the drainage ditch at 486 Atlantic Avenue, noone has ever filed an action against the Town to quiet title, or ever filed a "notice of intent to dispute" adverse possession under R.I. Gen. L. § 34-7-6, or ever made a physical ouster of the Town or its employees.

Plaintiff's house was built on pilings because of the flood level for the area and the potential storm surge of water from the pond or the ocean, so that the house can withstand a 100-year storm.[3] See Pl.'s Depo. pp. 157-158. The house is fourteen feet off the ground. See Pl.'s Depo. p. 158. The Town zoning requirements limited the area where Plaintiff could build on his property based upon set-back requirements of 30 feet in the front and rear, 15 feet on the western side and a 22 ½ feet on the eastern side. See Pl.'s Depo. pp. 129-130, 131-132; see also Plan of Land dtd. 4/12/01. In September 2006 Plaintiff was issued a Cease and Desist Order and Notice of Administrative Fine by the C.R.M.C. for his construction activities. See Pl.'s Depo. pp. 182-184; see also C.R.M.C.

---

[2] Plaintiff testified about a major alteration to the drainage swale that occurred in May 2005, after he owned the property, wherein it appeared that an excavator or similar piece of heavy equipment excavated a significant portion of the drainage ditch, increasing the size of the ditch "three or four fold." See Pl.'s Depo. pp. 91-92. The Town did not do this excavation, and never used any mechanical equipment for maintaining the ditch. See W. Palumbo Depo. pp. 15-17. Plaintiff blamed his neighbor Jefferson Henry for this alteration, who denied it. See Ltr. to J. Henry dtd. 5/16/08; see also Pl.'s Depo. pp. 91-92; J. Henry Depo. p. 58. Plaintiff admits he does not have evidence to establish who did the May 2005 alteration. See Pl.'s Depo. pp. 94-95. His own construction contractors, who had heavy equipment on site, denied any knowledge of the alteration of the drainage ditch. See Pl.'s Depo. pp. 99-100. The C.R.M.C. allowed Plaintiff to "restore" the area "to its previous condition" and once the area was filled in to spread a "conservation seed mix" on all exposed soils, which was done. See L. Miguel Ltr. dtd. 7/1/05; Pl.'s Depo. pp. 161-162.

[3] The original plan for construction contemplated a three bedroom house on piles. See Plan of Land dtd. 4/12/01. When reviewing the septic system application, the D.E.M. required the size of the home be limited to 2 bedrooms to accommodate the septic system. See Pl.'s Depo. pp. 115-116.

Cease & Desist Order & Notice of Admin. Fine dtd. 9/15/06. The Cease and Desist Order was for improper "filling of coastal wetland" and because Plaintiff "altered, and failed to permanently demarcate, the required buffer zone." See C.R.M.C. Cease & Desist Order & Notice of Admin. Fine dtd. 9/15/06. The Plaintiff's Plan of Land for Construction depicts two areas of "isolated coastal wetlands" on his property. See Plan of Land dtd. 4/12/01. The Plaintiff understood there may be wetlands on the parcel at the time he first looked at it with his engineer Mr. Spring, and then retained a biologist who confirmed the wetlands area. See Pl.'s Depo. pp. 54-55. Plaintiff's biologist Ms. Magnan physically flagged the wetlands by tying a flag in the area, which Plaintiff's engineer Mr. Spring then plotted on the Plan of Land showing two areas of "isolated wetlands." See Pl.'s Depo. pp. 124-125; see also Plan of Land dtd. 4/12/01.

The Plaintiff's construction placed gravel pea stone covering "the whole thing" of the eastern isolated wetland on his property, and an outdoor shower encroaching on the isolated wetland. See Pl.'s Depo. pp. 189-190; see also As-Built Plan for D. Ciampi. The construction also exceeded the original footprint of the building without C.R.M.C. being advised, and Plaintiff constructed a wooden deck outside the buffer zone of the construction. See Pl.'s Depo. pp. 191-192; see also As-Built Plan for D. Ciampi. Nonetheless, Plaintiff received his occupancy permit for the home in July or August 2006.and he spends time at the home on weekends and during the summer. See Pl.'s Depo. p. 199. Plaintiff was happy with the construction, feeling "the quality of it came out perfect." See Pl.'s Depo. p. 201.

In July 2006, amidst construction of a home on his property, Plaintiff's contractor discovered a subterranean pipe while installing a fence post with a backhoe. See Pl.'s Depo. p. 139. The Town of Westerly does not install nor own water service lines on private property. Paul Corina, the Superintendent of Utilities for Westerly, oversaw the Department responsible for water distribution

in the Town. See P. Corina Depo. pp. 3-4. For new construction, the Water Department requires the property owner seeking water service to run a water line from their basement to the property border, to hook into an existing service stop, or the Town would provide the water line from the water main pipe to the owners property border. See P. Corina Depo. pp. 20-21; 25. The Water Department does not inspect the installation on private property, nor survey whether the water service lines are properly within the private property boundaries. See P. Corina Depo. pp. 23-24; 30-31. The Property Owner is responsible for the repair and maintenance of water services lines on private property. See P. Corina Depo. p. 38.

The present practice today at the Water Department is to require proof of an easement where a water service line crosses another parcel of property in addition to the one it services. See P. Corina Depo. pp. 41-42. The Water Department service location cards for the water service crossing Plaintiff's parcel at 486 Atlantic Avenue date from the 1950's, indicating the water service to the two rear properties of 484½ Atlantic Avenue and 4 Shore Gardens Road were installed in 1958 and 1959. See P. Corina Depo. pp. 18, 26-27; see also Water Service Cards, Water Service Diagram, and accompanying P. Corina note dtd. 11/28/06; Water Service Cards for 484 ½ Atlantic Ave dtd. 5/15/58 & 4 Shore Garden Road dtd. 4/16/59. The water service diagram shows a service line running perpendicular to Atlantic Avenue providing water service to two residences owned by "Garofolo," but does not show property borderlines. See Water Service Cards, Water Service Diagram, and accompanying P. Corina note dtd. 11/28/06. The Plaintiff does not know who installed the water line, nor does he have any basis to contest that a private contractor installed the water line. See Pl.'s Depo. p. 145. The location of the water line did not effect the construction of the home, except for the one fence post that was dug. See Pl.'s Depo. p. 210. Neither of Plaintiff's neighbors Mr. Henry or Mr. Dubriel have easements for the use of Plaintiff's property for a water

service line. See Pl.'s Depo. p. 146; See J. Henry Depo. pp. 48, 53. Mr. Henry's understanding was that his water service line crossed underneath Plaintiff's property. See J. Henry Depo. pp. 51-53; 106.

Significantly, Plaintiff has not suffered any loss whatsoever from the existence of the drainage ditch or the subterranean water pipe on his property.[4] Plaintiff purchased property for $90,000 by agreement in August 2000. See Pl.'s Depo. pp. 48-49. Plaintiff estimates that an unimproved parcel of vacant land in the area of his home on Atlantic Avenue would now sell for $600,000 to $700,000, "if not more." See Pl.'s Depo. p. 50. The appraiser for Countrywide Home Loans valued the property as of September 2006 at $950,000. See Appraisal Report of G. Roch dtd. 9/22/06. Plaintiff sought an abatement of his tax assessment for the property in September 2006, and submitted documents to the Tax Assessor showing the tax valuation of his land at $506,000 and his building then under construction at $251,400, for a total tax value of $757,400. See Pl.'s Depo. pp. 149-150; see also Chart of Abutting Property Owner Values dtd 9/20/06. Defendant's expert appraised property value at $1,150,000 as of February 2008. See Appraisal Report of Lenihan Appraisal Co. dtd. 2/21/08. Defendants expert opines that existence of drainage ditch "is typical of the area and it is believed to have existed prior to the construction of the current residence. It has no impact on the value of the subject property." See Appraisal Report of Lenihan Appraisal Co. dtd. 2/21/08 at p. 9. Similarly, the expert appraisal report states "the presence of wetlands on the property is typical on the pond side of Atlantic Avenue and have existed naturally from the beginning. They

---

[4] Nonetheless, due to the statute of limitations, Plaintiff would not be entitled to damages sustained more than three years prior to the commencement of his action, which was filed June 15, 2007. See, e.g. Murphy v. Town of Chatham, 41 Mass.App.Ct. 821, 827, 676 N.E.2d 473, 478 (1996). There is no evidence of any increase in damages from the drainage ditch and water line from June 2004 to present.

have no impact on the current market value as compared to other properties in the immediate neighborhood." See Appraisal Report of Lenihan Appraisal Co. dtd. 2/21/08 at p. 9.

## III. STANDARD OF REVIEW

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once the movant avers 'an absence of evidence to support the nonmoving party's case, ... the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" Sheinkopf v. Stone, 927 F.2d 1259, 1261 (1st Cir. 1991) (emphasis added). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the [fact finder] could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). While a court must examine the record in the light most favorable to the opposing party, "Rule 56 does not invite a court to enter the realm of surmise." Local 48 v. United Brotherhood of Carpenters & Joiners, 920 F.2d 1047, 1051 (1st Cir. 1990). "[W]here elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994) (citations omitted).

## IV. ARGUMENT

### A. The Town Acquired a Prescriptive Easement for the Drainage Ditch

Under Rhode Island law, "[a] right to the flowage of water and the disposal of waste in pipes or drains through lands of another may be acquired by prescription." Greenwood v. Rahill, 122 R.I. 759, 762 (1980). The Rhode Island Supreme Court has repeatedly stated that "one who claims an

easement by prescription has the burden of establishing actual, open, notorious, hostile, and continuous use under a claim of right for ten years," as required by R.I.G.L. § 34-7-1.[5] Burke-Tarr Co. v. Ferland Corp., 724 A.2d 1014, 1020 (1999) (citing Palisades Sales Corp. v. Walsh, 459 A.2d 933, 936 (R.I. 1983)). The Rhode Island Supreme Court has cautioned, however, that "no particular act to establish an intention to claim ownership is required. It is sufficient if one goes upon the land openly and uses it adversely to the true owner, the owner being chargeable with knowledge of what is done openly on his land." Greenwood, 412 A.2d at 230.

The very act of openly placing a permanent physical structure on another's property without the true owner's permission, and maintaining it there for more than ten years, is itself an action that is so inconsistent with the true ownership of that property that it is therefore "notorious," "adverse," "hostile," and under "claim of right," as elements for adverse possession or easement by prescription. See Reitsma v. Pascoag Reservoir & Dam, LLC, 774 A.2d 826, 846 (R.I. 2001) (where the state installed a public boat ramp adjacent to a privately owned lake). The present case parallels Greenwood, where a highway drainage pipe constructed and maintained by the state allegedly caused flooding of the plaintiff's property on Watch Hill Road in Westerly.[6] Greenwood, supra 412

---

[5] The Rhode Island statute providing for such prescriptive easements reads:

"Where any person or persons, or others from whom he, she, or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, the actual seisin and possession shall be allowed to give and make a good and rightful title to the person or persons, their heirs and assigns forever; and any plaintiff suing for the recovery of any such lands may rely upon the possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall be brought for the lands, tenements or hereditaments, and the actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring the action." R.I. Gèn. L. § 34-7-1.

[6] Notably, a separate section of the General Laws limits prescriptive easements for utility rights-of-way for "telegraph, telephone, electric, or other posts, wires or apparatus." See R.I. Gen. L. § 34-

A.2d at 229. The State admitted construction and maintenance of the drain but claimed the existence of a prescriptive easement giving it the right to continue directing surface runoff water onto the plaintiffs' property. Id. The trial justice found that the state had acquired a prescriptive easement and dismissed the complaint.[7] Id.

The Greenwood case is consistent with other jurisdictions' rulings that long-existing drainage ditches (or similar features) create prescriptive rights. See, e.g. Fratesi v. City of Indianola, 972 So.2d 38 (Miss.App. 2008) (holding City proved a prescriptive easement in drainage ditches where the ditches running alongside avenue had been in existence as long as landowner could remember, the public had used the road for decades, city had maintained the road); Dutcher v. Town of Shandaken, 23 A.D.3d 781, 803 N.Y.S.2d 756 (N.Y.A.D. 3 Dept., 2005) (holding Town had easement by prescription for drainage area for public highway located on landowner's property, given that culvert and swale area to brook were open, obvious, and continuously maintained by town for more than 30 years, and therefore town did not trespass when, to reopen culvert and drainage area, it dug ditch through dirt that landowner had used to block culvert and drainage area and had refused to remove); Radke v. Independence Tube Corp., 301 Ill.App.3d 713, 704 N.E.2d 72, 234 Ill.Dec. 914 (Ill.App. 3 Dist., 1998) (holding possessor of express easement for railroad right of way acquired easement by prescription in drainage ditches on each side of express easement that had been openly used for draining and had encroached on surrounding land without permission and under claim of

---

7-5. Neither a drainage ditch nor a subterranean water line are among the specific utilities listed in the statute, and the R.I. Supreme Court has held that the specific language of this statute does not prevent a dominant estate owner from establishing a prescriptive easement for an apparatus that "bears little resemblance to the utilities that are mentioned." Burke-Tarr Co. v. Ferland Corp., 724 A.2d 1014, 1019 (R.I. 1999) (holding subterranean water line not within restrictions of statute).

[7] The Supreme Court did not address any constitutional issues because plaintiffs failed to raise them in the original suit. Id. at 230.

right for 20 years); Village of Forrest v. Norfolk & Western Ry. Co., 146 Ill.App.3d 20, 496 N.E.2d 257, 99 Ill.Dec. 682 (Ill.App. 4 Dist., 1986) (holding evidence sufficient to establish that waters from portion of lands lying within village had been draining into drainage ditch for more than 20 years so as to give village and its residents prescriptive rights to use drainage ditch); City of Mountain Brook v. Beatty, 292 Ala. 398, 295 So.2d 388 (1974) (holding city acquired drainage easement across complainants' property by prescription where, for more than 20 years, a city storm drainage pipe had emptied into ditch traversing plaintiffs' lot). Suffice it to say that in Rhode Island, "a state or municipal government, or one of its subdivisions, also can acquire a prescriptive easement over otherwise private property, on behalf of the public, whether or not the public alone could do so." Reitsma v. Pascoag Reservoir & Dam, LLC, 774 A.2d 826, 833 (R.I. 2001).

In the present case, the maintenance of the drainage ditch entering 486 Atlantic Avenue meets all of the elements of prescriptive easement: 1) actual, 2) open, 3) notorious, 4) hostile, and 5) continuous use under a claim of right for ten years. See Burke-Tarr Co. v. Ferland Corp., 724 A.2d 1014, 1020 (1999). It is not disputed that the ditch has actually existed since the 1960s. The existence of the drainage ditch was openly visible, it was known to the neighbors and abutters. The maintenance of drainage ditch was done as a matter of right by the Department of Public Works, who entered on the property without permission from the owners. The drainage ditch carried water flow from Atlantic Avenue onto the parcel during rain storm events which regularly caused flooding in the area. The maintenance by clearing brush and overgrowth with hand tools occurred regularly since at least 1978 when Mr. Palumbo first began work. Thus the Town acquired a prescriptive easement for the use and maintenance of the drainage ditch.

As the Rhode Island Supreme Court explained, "a claim of right to own or use property will arise by implication through objective acts of ownership that are adverse to the true owner's rights,

one of which is to exclude or to prevent such use." Reitsma v. Pascoag Reservoir & Dam, LLC, 774 A.2d 826, 832 (R.I. 2001). "When confronted with such an open, unsolicited, and long-continued use of the property, the true owner must affirmatively communicate either objection or permission to stop the statutory prescriptive period from running. Mere acquiescence or silence, however, in the face of uses that are inconsistent with the true owner's property rights, does not constitute permission." Id. There is no evidence that anyone objected to the maintenance of the drainage ditch at any time from the beginning of its existence over 40 years ago until Plaintiff agreed to purchase it in 2000.[8]

Nor may Plaintiff argue that any lack of knowledge of the drainage ditch at the time of the purchase and sale agreement voids the prescriptive easement.[9] The R.I. Supreme Court squarely rejected the argument that the visible obscurity of a drainage ditch at the time of purchase vitiates a prescriptive easement. In Greeenwood, the Court stated plaintiffs discovery of the culvert and drain when covered by brush "was only a temporary condition since ... the state's routine maintenance program requires the periodic cleaning out of all culverts and basins. In any event, the discovery by plaintiffs was made long after the statutory prescriptive period had run. Once the state had acquired a prescriptive easement to drain the surface runoff water upon plaintiffs' land, no act

[8] There are only a limited number of means that may be utilized to terminate a prescriptive easement. Similar to adverse possession, a record owner in Rhode Island may subvert or successfully interrupt ones actual, open, notorious, hostile, and continuous use under a claim of right in three ways: (1) filing of an action to quiet title, Cumberland Farms, Inc. v. Mayo Corp., 694 A.2d 752, 753 (R.I.1997); (2) filing of "notice of intent to dispute" adverse possession under § 34-7-6; and (3) physical ouster of the claimant or a "substantial interruption" of the claimant's possession by the record owner. LaFreniere v. Sprague, 108 R.I. 43, 52, 271 A.2d 819, 824 (1970). These actions to terminate the prescriptive easement must be accomplished during the prescriptive period, here in Rhode Island of ten years. See R.I. Gen. L. § 34-7-1.

[9] As a practical matter, due to the nearly three year delay between the purchase agreement and final closing of title, Plaintiff had actual knowledge of the ditch for over two years before acquiring title.

of plaintiffs could divest the state of that right since such an easement conveys a good and rightful title forever." Greenwood v. Rahill, 122 R.I. 759, 763, 412 A.2d 228, 230 (1980) (emphasis added). In this respect the Greenwood case is nearly identical to the allegations by Plaintiff David Ciampi, requiring a finding of prescriptive easement.

**B. The Prescriptive Easement Precludes Liability**

Once the elements for a prescriptive easement have been met, "a prescriptive easement conveys a good and rightful title forever." Burke-Tarr, 724 A.2d at 1020 (citing Greenwood, 412 A.2d at 230). In Rhode Island a prescriptive easement is presumed to be a so-called "easement appurtenant," which "conveys a good and rightful title forever." McAusland v. Carrier, 880 A.2d 861, 863, 864 n. 5 (R.I. 2005). The right to maintain the drainage ditch is incident to the prescriptive easement and includes the rights to make repairs, to ingress and egress with space therefor as an exigency may require.[10] See, e.g. Stoll v. MacPherson Duck Club, Ltd., 43 Colo.App. 377, 607 P.2d 1019 (1979).

Because the Town has a right by prescriptive easement to discharge surface waters via the drainage ditch onto Plaintiff's property, the Plaintiff cannot recover under any Counts of the Complaint. Both the so-called "Eminent Domain" count and the Due Process counts require the Plaintiff to have a property interest. See e.g. E & J Inc. v. Redevelopment Agency of Woonsocket, 122 R.I. 288, 291, fn. 1, 405 A.2d 1187, 1189 (1979) (defining "inverse condemnation" actions); Mard v. Town of Amherst, 350 F.3d 184, 188 (1st Cir. 2003) (stating the "threshold issue in a procedural due process action is whether the plaintiff had a constitutionally protected property

---

[10] Furthermore, even absent an easement, the Town is "legally privileged to make a reasonable use of [its] land, even though the flow of surface waters is altered thereby and causes some harm to others." See Butler v. Bruno, 115 R.I. 264, 273, 341 A.2d 735 (R.I. 1975); see also Restatement (Second) Torts § 833 (discussing the "reasonable use" doctrine).

interest at stake"). Plaintiff cannot recover for due process claims or a claim of taking without compensation where Plaintiff had no property interest infringed due to the prescriptive easement. Similarly the "unjust enrichment" claim must fail because the Town obtained it's right to use of the land by prescription under the law. Nor may a "trespass" exist where the Town has a legal right by prescriptive easement to use the ditch for drainage.[11] See Restatement (Second) Torts, § 158 at 277 (1965) (defining trespass to include entry on the land in the possession of another). In short, the Defendants are entitled to summary judgment upon all of Plaintiff's claims.

### C. The Town did not Own, Install, nor Maintain the Subterranean Water Line

The Summary Judgment record establishes that the Town of Westerly did not own, install nor maintain the subterranean water line found on Plaintiff's property which services two abutting properties. The Water Department for the Town is only responsible for water service lines that run from the water main to the private property borderline. It is the private property owner who must install and maintain the water service line that runs inward from the property borderline to the residence. The water service card records reflect the disputed water line was installed around 1958 or 1959. The Town's schematic diagrams of the water service lines from that era do not record the private property borders, nor was the Town obligated to conduct a land survey to ensure private contractors installed the water service line on the correct property. There is simply no evidence that the Town installed the water service line, nor maintained it on private property. Instead, Plaintiff should be seeking compensation and/or an easement from his abutting property owners whose homes are serviced by the water line. Because the water service line is not Town-owned or maintained, the

[11] This Court need not address Count VI of the Complaint, entitled "Indemnification," because such a claim is merely derivative of wrongful conduct, none of which occurred here. See Black's Law Dictionary (8th ed. 2004) (defining "indemnification" as "[t]he action of compensating for loss or damage sustained.")

Town cannot be held liable for any alleged damages caused by the presence of the line on private property. Thus, the Town is entitled to summary judgement.

**D. The Plaintiff Cannot Recover for a Taking of Property before Plaintiff was Owner**

It is beyond dispute that the drainage ditch has existed since at least the 1960's and that the subterranean water line was installed in approximately 1958-1959. Plaintiff did not first contract to purchase the property until 2000, and the title was not conveyed until 2003. Any "taking" of property effected by the drainage ditch or the water lines therefor occurred four decades before Plaintiff had any ownership interest in the parcel.[12] The U.S. Supreme Court, in a case arising out of the very area of land in Westerly R.I. that is in dispute in this case, held "it is a general rule of the law of eminent domain that any award goes to the owner at the time of the taking, and that the right to compensation is not passed to a subsequent purchaser." Palazzolo v. Rhode Island, 533 U.S. 606, 628 (2001) (emphasis added); see also Pascoag Reservoir & Dam, LLC v. Rhode Island, 337 F.3d 87, 94 n. 6, (1st Cir. 2003) (noting principle that owner at time of taking receives compensation).

This rule applies "when a State has physically invaded the property without filing suit." Palazzolo, supra 533 U.S. at 628. The Palazzolo Court cited an earlier U.S. Supreme Court case wherein the rationale behind this well-settled rule was explained: "Just compensation is value at the time of the taking. ... For the reason that compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment." Danforth v. U.S., 308 U.S. 271, 283-284 (1939) (emphasis added). This principle is consistent with Rhode Island common law. See

[12] Plaintiff has mislabeled his claim in Count I as "Eminent Domain," which should have more properly been characterized as "inverse condemnation." "'Inverse condemnation' is a term used to describe a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." E & J, Inc. v. Redevelopment Agency of Woonsocket, 122 R.I. 288, 290 n. 1, 405 A.2d 1187, 1189 n. 1 (1979) (citations omitted).

In re Southern New England Ry. Co., 94 A. 853, 854 (1915) (holding deed conveying land subject to any easement acquired by railroad company under condemnation proceedings did not give the grantee any claim for compensation for the easement). Because the drainage ditch and water line existed for over 40 years before the Plaintiff purchased the property, Plaintiff cannot recover for a claimed "taking" created by these intrusions, and the Defendants are entitled to summary judgment.

**E. No Procedural Due Process Violation Because of Adequate Post-Deprivation Remedies**

In a civil rights action under § 1983, the plaintiff must prove, by a preponderance of the evidence, that a person acting under color of state law deprived the plaintiff of a Constitutional or federally protected right. Tatro v. Kervin, 41 F.3d 9, 14 (1st Cir. 1994). The plaintiff must identify a specific right derived from a specific provision of the Constitution or federal law. Id.; see also, Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 811, (1994). In the present case, Plaintiff's Amended Complaint identifies the civil rights at stake as the right to procedural and substantive due process. See Pl.'s Amend. Compl., Counts II & III. Both claims must fail.

The Fourteenth Amendment provides that "no State shall . . . deprive any person of life, liberty or property without due process of law." U.S. Const. amend XIV. The procedural component of the Due Process Clause of the Fourteenth Amendment requires that, before an individual is deprived of a constitutionally protected property interest by government action, he must be given "notice and opportunity for hearing appropriate to the nature of the case."[13] Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542 (1985). "The constitution does not require every

[13] "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." Matthews v. Eldridge, 424 U.S. 319, 333 (1976). Rather, the standard is flexible and "calls for such procedural protection as the particular situation demands." Id.; see also Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) (requiring "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

procedural protection that might help; it simply requires that a private person have a basically fair opportunity to convince the decision-maker, by presenting proofs and arguments and evidence and replies to the arguments of others." Newman v. Burgin, 930 F.2d 955, 961 (1st Cir. 1991). Here, the Plaintiff alleges that the "taking of Ciampi's Property" denied him "procedural due process rights." See Pltf.s' Amend. Compl. ¶ 31. As set forth above, the Plaintiff cannot maintain a takings claim because he was not the owner of the property at the time of the alleged taking.[14] See Palazzolo v. Rhode Island, 533 U.S. 606, 628 (2001).

Assuming arguendo that Plaintiff had a property interest at stake, there was no Due Process violation. Due process usually requires that adequate process be provided before a property interest is deprived by state action. Cleveland Board of Education v. Loudermill, supra, 407 U.S. at 542. In some instances, however, the availability of remedies after a deprivation occurs will comport with due process requirements. Zinermon v. Burch, 494 U.S. 113 (1990). One circumstance under which the availability of post-deprivation remedies becomes relevant is where a property interest is allegedly divested by the "random and unauthorized" conduct of government actors. Lowe v. Scott, 959 F.2d 323, 340-341 (1st Cir. 1992); see also, Rumford Pharmacy v. City of East Providence, 970 F.2d 996, 999 (1st Cir. 1992). Plaintiff here has adequate post-deprivation remedies for any such deprivation of property, as exemplified by the potential inverse condemnation action under state law. See Culebras Enterprises Corp. v. Rivera Rios, 813 F.2d 506 (1st Cir. 1987). The plaintiff's post-deprivation state-law remedies were more than adequate to protect his due process rights, and, hence, the resort to Section 1983 is unavailable. See, e.g. Cormack v. Settle-Beshears, 474 F.3d 528, 532

[14] Furthermore, the "protections of procedural due process are not triggered unless [Plaintiff] can show [he] has been deprived of a protectable liberty or property interest." Fireside Nissan, Inc. v. Fanning, 30 F.3d 206, 219 (1st Cir. 1994).

(8th Cir. 2007) (holding City's annexation of property owner's land without prior notice of annexation hearing did not violate the due process clause, absent showing of a lack of adequate post-deprivation mechanism to provide owner with just compensation).

**F. No "Conscious-Shocking" Conduct As Required for Substantive Due Process Claim**

The First Circuit recently reiterated its dim view of substantive due process claims in the land-use context in a case where a City "exercised its eminent domain power to occupy thirty-eight acres of [Plaintiff's] property for the purpose of water supply protection." Clark v. Boscher, 514 F.3d 107, 111 (1st Cir. 2008). "Substantive due process is a constitutional cause of action that leaves the door 'slightly a jar for federal relief in truly horrendous situations.' In order to assert a valid substantive due process claim, Appellants have to prove that they suffered the deprivation of an established life, liberty, or property interest, and that such deprivation occurred through governmental action that shocks the conscience." Clark v. Boscher, 514 F.3d 107, 112 -113 (1st Cir. 2008) (citing Néstor Colón-Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir.1992); Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir.2006); Rivera v. Rhode Island, 402 F.3d 27, 33-34 (1st Cir.2005)). Thus in order to assert a valid substantive due process claim, a plaintiff who was involved in a land-use dispute is required to prove that the defendant municipal government's actions "shocked the conscience." Mongeau v. City of Marlborough, 492 F.3d 14, 17 (1st Cir.2007).

"Consequently, a run-of-the-mill land-use case such as this one does not rise to the level of behavior that shocks the conscience. Here, [plaintiffs] do not allege any 'fundamental procedural irregularity, racial animus, or the like.' Nor do they contend that a fundamental principle has been violated." Clark v. Boscher, 514 F.3d 107, 113 (1st Cir. 2008) (citing Creative Environments, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir.1982); Amsden v. Moran, 904 F.2d 748, 754 (1st Cir.1990)). Thus, in the First Circuit, before an infringement of constitutional proportions occurs,

"state action must in and of itself be egregiously unacceptable, outrageous, or conscience-shocking." Amsden, 904 F.2d at 754 (emphasis in original). In the present case, even as alleged, the Town's construction of the drainage ditch to alleviate flooding on Atlantic Avenue, or the installation of a water service line, simply is not "conscious-shocking" conduct as required to sustain a Substantive Due Process Claim.. See Mongeau v. City of Marlborough, 429 F.3d 14 (2007) ("[I]n order to state a substantive due process claim of any ilk, a plaintiff must allege [such] behavior on the part of the defendant.). The Defendants are entitled to summary judgment.

## V. CONCLUSION

For the foregoing reasons, the Defendants respectfully request that this Honorable Court grant their Motion for Summary Judgment as to all counts of Plaintiff's Complaint against them, together with costs and attorneys fees and such other relief this Court deems just and proper.

Respectfully submitted,
The Defendants,
By their attorneys,

**PIERCE, DAVIS & PERRITANO, LLP**

/s/ John J. Cloherty III
John J. Cloherty III, RI Bar No. 5068
Ten Winthrop Square
Boston, MA 02110
(617) 350-0950

Rhode Island Office:
128 Dorrance St., Suite 400
Providence RI 02903
(866) 896-4901

CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon each attorney of record, by electronic filing.

08/11/08 /s/ John J. Cloherty III