UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DAVID M. CIAMPI,
Plaintiff

v.

ETSUKO MOTOKI ZUCZEK, in her capacity as Finance Director of the Town of Westerly; PAUL CORINA, in his capacity as Superintendent of Water of the Town of Westerly, and PETER CHIARADIO, in his capacity as Superintendent of Public Works of the Town of Westerly,
Defendants

C.A. NO. 07-256 S

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to L.R. Cv. 56 of the Local Rules of the United States District Court for the District of Rhode Island, the Defendants submit the following concise statement of the material facts of record as to which Defendants contend there are no genuine issues to be tried:

**The Locus**

1. Plaintiff David Ciampi is the present owner of a parcel of property known as 486 Atlantic Avenue, Westerly RI, that is the subject of this Complaint. See Pl.'s Amend. Compl. ¶ 1.

2. Plaintiff resides in Connecticut, and owns another home in Westerly at 24 Kimball Avenue that he had built in 1998. See Pl.'s Depo. pp. 9, 12-13 (attached hereto as **Exhibit A**).

3. Due to its proximity to Block Island Sound and Winnapaug Pond, Atlantic Avenue is susceptible to periodic flooding during storms characterized by heavy rains and high tides. See J. Henry Depo. pp. 129-130 (attached hereto as **Exhibit B**).

4. The area in the vicinity of the property is a barrier beach between the Atlantic Ocean and Winnapaug Pond. See Pl.'s Depo. pp. 29-30.

5. A plot map of the property reflects that Plaintiff's lot is number 65 at the corner of Atlantic Avenue and Shore Gardens Road. See Plot Maps (attached hereto as **Exhibit C**); See also Pl.'s Depo. pp. 110-111.

6. The plot map shows several roadways to the north of Plaintiff's parcel that do not exist in actuality, and also depicts a salt marsh area to the east of Plaintiff's property in Lot number 148. See Plot Maps; See also Pl.'s Depo. pp. 112-114.

7. Plaintiff's property is across the street from the ocean front homes (to the south). See Pl.'s Depo. pp. 49-50.

8. Plaintiff's property is about 100 feet from Winnapaug Pond (to the north). See Pl.'s Depo. p. 197.

9. The pond is a large tidal salt water pond approximately 1½ miles long and 1/4 mile wide. See T. McGrath Depo. p. 9 (attached here as **Exhibit D**).

10. During rainfalls or storm surges there is periodic flooding and pooling of water along Atlantic Avenue in the vicinity of Plaintiff's address. See J. Henry Depo. pp. 24-25; 44.

11. Plaintiff's abutter, Mr. Jefferson Henry's property is regularly surrounded by water from the proximity of the tidal pond when storms occur during high tides. See J. Henry Depo. pp. 15-16; 21-22.

12. Plaintiff's abutter, Mr. Dubreuil experiences flooding on his property at depths of 1½ feet of water approximately two times per year during storm events, and other lesser flooding regularly. See F. Dubreuil Depo. pp. 14-16.

**Ownership of the Parcel**

13. The Plaintiff first visited the vacant lot at 486 Atlantic Avenue in August 2000 in response

to an advertisement. See Pl.'s Depo. pp. 34-35.

14. The parcel size is approximately 70 feet by 150 feet. See Pl.'s Depo. pp. 35-36.

15. The prior owners of the property were Rose and Caroline Turco. See Pl.'s Depo. pp. 40-41; See A. Turco Depo. pp. 11-13 (attached hereto as **Exhibit E**).

16. The parcel lies within a flood plain. See Pl.'s Depo. pp. 42-43.

17. Plaintiff brought an engineer, Eugene Spring, and biologist, Kathleen Mangan, to inspect the parcel in September 2000 on Labor Day Weekend. See Pl.'s Depo. pp. 44.

18. Plaintiff made an offer to purchase the parcel, negotiated the purchase price to $90,000 and made a deposit payment of between $500-$1000, within a week or two of first visiting the property. See Pl.'s Depo. pp. 48-49.

19. At the time of the purchase agreement, the property was a flat, vacant lot, overgrown with brush and poison ivy, with the brush being about waist high. See Pl.'s Depo. p. 35.

20. The time from the initial purchase contract until the property was conveyed was about 3 years. See A. Turco Depo. pp. 26-27.

21. The purchase of the property did not close until December 2003. See Trustee's Deed dtd. 12/17/2003 and accompanying HUD Settlement Stmt. (attached hereto as **Exhibit F**).

22. Because of the location of the property, a Coastal Resources Management Council ("CRMC") permitting process is required prior to commencing development. See Pl.'s Depo. pp. 52-53; see also R.I. Gen.L. § 46-23-2 (creating the coastal resources management council); § 46-23-6 (stating powers and duties of CRMC including authority over land areas above the mean high water mark within two hundred feet (200') from the coastal physiographic feature, to approve, modify, set conditions for, or reject the design, location,

construction, alteration, and operation of specified activities or land uses).

23. To build on the lot Plaintiff also required state approval from the Department of Environmental Management for the septic system. See Pl.'s Depo. p. 53.

**The Drainage Ditch**

24. Plaintiff testified that in the October-November 2000 time frame was when his engineer Eugene Spring first mentioned the existence of the drainage ditch to Plaintiff. See Pl.'s Depo. pp. 60-61.

25. At that time the drainage swale "was draining water from Atlantic Avenue onto the property." See Pl.'s Depo. p. 60.

26. The ditch was a "V" shaped swale about 2 feet wide and 1½ feet deep sloping away from the street. See Pl.'s Depo. p. 63.

27. The location of the ditch is depicted on a Plan of Land Plaintiff submitted to the Department of Environmental Management for approval of the Septic System. See Pl.'s Depo. p. 116; see also Plan of Land dtd. 4/12/01 (attached hereto as **Exhibit G**).

28. The ditch runs approximately 125 feet perpendicular to Atlantic Avenue. See Plan of Land dtd. 4/12/01.

29. The ditch is not even on Plaintiff's property at first, starting on his neighbor McGrath's property and enters onto Plaintiff's property after about 60 feet, thereafter it drains into an "isolated wetland" area upon Plaintiff's property. See Plan of Land dtd. 4/12/01; see also Pl.'s Depo. pp. 64-65 (acknowledging drainage swale runs on neighboring McGrath property).

30. Plaintiff contemplated withdrawing from the purchase and sale agreement upon the discovery

of the swale, but went forward in seeking to get the lot approved for construction. See Pl.'s Depo. p. 67.

31. Plaintiff was told by officials at CRMC that it would not allow Plaintiff to fill the drainage swale. See Pl.'s Depo. pp. 75; 86-88.

32. Plaintiff agreed that photographs of drainage swale as it appeared in November 2001, when the overgrown vegetation had turned brown for the winter, accurately depicted the appearance at that time. See Pl.'s Depo. pp. 82-86; see also Three photocopies of Polaroid Photographs (attached hereto as **Exhibit H**).

33. There is no written record of the Town, or anyone else, creating the drainage ditch.

34. Plaintiff's neighbor, Jefferson Henry, has lived next door at 484½ Atlantic Avenue since 1991, but not full-time due to various military assignments until December 1999. See J. Henry Depo. pp. 3, 8, 10.

35. Mr. Henry's father owned the property sine 1970, and Mr. Henry regularly visited the property each weekend and all summer since he was age 10. See J. Henry Depo. pp. 10, 13-14.

36. The flooding or puddling along Atlantic Avenue in the vicinity of Plaintiff's property has been occurring during rain events since Mr. Henry was a child. See J. Henry Depo. pp. 24-26.

37. Mr. Henry was aware of the drainage ditch that runs on Mr. McGrath's property and onto Plaintiff's property. See J. Henry Depo. pp. 30-31.

38. The ditch has been in existence since Mr. Henry's childhood during the 1970's, and he recalls crunching the ice that formed on the ditch in the mid-to-late 1970's. See J. Henry Depo. pp.

35-36; 106.

39. Francis Dubreuil, another abutter to Plaintiff, has lived at 4 Shore Garden Road full-time since 1996, had owned the property and visited weekends since 1986, and had been a summer guest at the home when owned by his in-laws since 1960. See F. Dubreuil Depo. pp. 5-8 (attached hereto as **Exhibit I**).

40. Mr. Dubreuil described the ditch as being 150 feet long and had been there since the early 1960's to drain water from the roadway. See F. Dubreuil Depo. pp. 30-31.

41. Mr. Dubreuil agreed that the drainage ditch was obvious to anyone who walked by and there was nothing hidden about it, except it was occasionally overgrown with grass. See F. Dubreuil Depo. pp. 86-87.

42. Mr. Dubreuil saw Town workers clearing the drainage in the Spring of every year. See F. Dubreuil Depo. p. 33.

43. Wayne Palumbo, the Assistant Superintendent of the Town Highway Department, was familiar with Plaintiff's property at 486 Atlantic Avenue and had cleaned the "trough" out since he started employment in 1978, using shovels and a square spade, and never using mechanical equipment. See W. Palumbo Depo. pp. 4, 11-13, 15-17 (attached hereto as **Exhibit J**).

44. Mr. Palumbo did not know when the drainage ditch first came into existence. See W. Palumbo Depo. pp. 35-36.

45. Mr. Palumbo had a list of waterways and troughs maintained by the Town, which maintenance continues to the present day, and he was unaware of whether any easements existed for such work. See W. Palumbo Depo. pp. 20-21, 27.

46. Mr. Palumbo said this type of work on Plaintiff's property was scheduled once a year in the summer months, and this continued until at least the year 2000. See W. Palumbo Depo. pp. 14, 16.

47. The work consisted of removing sediment and runoff, and the Town did not alter the depth or the width of the drainage ditch when doing the maintenance at any time from 1978 to 2000. See W. Palumbo Depo. p. 35.

48. Mr. Antorch, a former Assistant Superintendent of the Highway Department, was familiar with the area of Plaintiff's property and would occasionally go onto the property to clear the mouth of the trench from weeds and overgrowth to release water from the roadway for safety purposes. See F. Antorch Depo. pp. 4, 11-13 (attached hereto as **Exhibit K**).

49. Mr. Antorch did this maintenance once a year or as needed. See F. Antorch Depo. p. 14.

50. Mr. Antorch did not know who owned the property nor did he seek permission from the owners for the maintenance. See F. Antorch Depo. pp. 15-16.

51. Former Superintendent of Public Works John Fusaro testified that in the early 1990's he had work crews "cut swaleways" with hand shovels to alleviate a flooding problem that plagued Atlantic Avenue. See J. Fusaro Depo. pp. 14-16 (attached hereto as **Exhibit L**).

52. These "swaleways" existed in other locations throughout town in an attempt to alleviate a safety issue created by flooding. See J. Fusaro Depo. pp. 17-18.

53. Such work would have been done by hand or shovels, and Mr. Fusaro did not personally observe it, but relied on his Assistants Mr. Palumbo and Mr. Antorch. See J. Fusaro Depo. pp. 21-23.

54. Mr. Fusaro did not seek the owner's permission, nor get state approval for the swale-way

work. See J. Fusaro Depo. pp. 15, 19, 23.

55. Current Superintendent Mr. Chiaradio acknowledges that the Town has in the past performed minor cleaning and clearing of the waterways with hand tools so that the water would flow properly. See P. Chiaradio Depo. pp. 3, 20 attached hereto as **Exhibit M**).

56. As it relates to the maintenance of the drainage ditch at 486 Atlantic Avenue, no one has ever filed an action against the Town to quiet title.

57. As it relates to the maintenance of the drainage ditch at 486 Atlantic Avenue, no one has ever filed of "notice of intent to dispute" adverse possession under R.I. Gen. L. § 34-7-6

58. As it relates to the maintenance of the drainage ditch at 486 Atlantic Avenue, no one has ever made a physical ouster of the Town or its employees.

**The Unattributed May 2005 Alteration to the Drainage Ditch**

59. Plaintiff testified about a major alteration to the drainage swale that occurred in May 2005, after he owned the property, wherein it appeared that an excavator or similar piece of heavy equipment excavated a significant portion of the drainage ditch, increasing the size of the ditch "three or four fold." See Pl.'s Depo. pp. 91-92

60. Plaintiff sent letters to his neighbor Jefferson Henry blaming him for this alteration. See Ltr. to J. Henry dtd. 5/16/08 (attached here as **Exhibit N**); see also Pl.'s Depo. pp. 91-92

61. Mr. Henry denied having done the excavation. See J. Henry Depo. p. 58; see also Pl.'s Depo. p. 92.

62. At his deposition Plaintiff admits he does not have evidence to establish who did the alteration. See Pl.'s Depo. pp. 94-95.

63. This major alteration to the ditch took place before Memorial Day in May 2005, when

Plaintiff's construction was ongoing on his property. See Pl.'s Depo. pp. 99-100.

64. Plaintiff's contractor's had heavy equipment on site, yet his contractors denied any knowledge of the alteration of the drainage ditch. See Pl.'s Depo. pp. 99-100.

65. The CRMC was notified and upon inspection agreed that Plaintiff himself did not alter the ditch. See L. Miguel Ltr. dtd. 7/1/05 (attached hereto as **Exhibit O**).

66. The CRMC allowed Plaintiff to "restore" the area "to its previous condition" and once the area was filled in to spread a "conservation seed mix" on all exposed soils. See L. Miguel Ltr. dtd. 7/1/05.

67. Plaintiff did restore the property as permitted by CRMC See Pl.'s Depo. pp. 161-162.

**The Isolated Coastal Wetlands**

68. The Plaintiff's Plan of Land for Construction depicts two areas of "isolated coastal wetlands" on his property. See Plan of Land dtd. 4/12/01.

69. The Plaintiff understood there may be wetlands on the parcel at the time he first looked at the parcel with his engineer Mr. Spring, and then retained a biologist who advised him there was an isolated area of wetlands. See Pl.'s Depo. pp. 54-55.

70. There is no competent evidence to establish whether the isolated wetlands were pre-existing salt water wetlands common in the area, or whether they were fresh-water wetlands created solely by storm-water runoff.

71. Plaintiff only points to hearsay verbal statements by an engineer that "a couple of cattails," which "looked like freshwater rather than saltwater." See Pl.'s Depo. p. 45.

72. Plaintiff himself could not distinguish types of "cattails." See Pl.'s Depo. p. 46.

73. Plaintiff's biologist never put in writing an opinion that the isolated wetlands were

freshwater as opposed to salt water. See Pl.'s Depo. pp. 156-157.

74. The northern triangle of isolated wetlands is comprised of brush, there is no standing water except during a storm event, which dissipates into the ground after a day or so. See Pl.'s Depo. pp. 122-123.

75. The eastern isolated wetland is "just grassy vegetation" with no standing water. See Pl.'s Depo. pp. 123-124.

76. Plaintiff's biologist Ms. Magnan physically flagged the wetlands by tying a flag in the area, which Plaintiff's engineer Mr. Spring then plotted on the Plan of Land. See Pl.'s Depo. p. 124-125; see also Plan of Land dtd. 4/12/01.

77. Plaintiff's abutter, Mr. Dubreuil, testified that the area that was red flagged as wetlands had been in that condition as wetlands since the 1960's and had not changed until Plaintiff's construction on the parcel. See F. Dubreuil Depo. pp. 18-20.

**Plaintiff's Home Construction**

78. The original plan for construction contemplated a three bedroom house on piles. See Plan of Land dtd. 4/12/01.

79. When reviewing the septic system application, the D.E.M. required the size of the home be limited to 2 bedrooms to accommodate the septic system. See Pl.'s Depo. pp. 115-116.

80. Plaintiff's house was built on pilings because of the flood level for the area and the potential storm surge of water from the pond or the ocean, so that the house can withstand a 100-year storm event. See Pl.'s Depo. pp. 157-158.

81. The house is fourteen feet off the ground. See Pl.'s Depo. p. 158.

82. The Town zoning requirements limited the area where Plaintiff could build on his property

based upon set-back requirements of 30 feet in the front, 30 feet in the rear, 15 feet on the western side and 22 ½ feet on the eastern side. See Pl.'s Depo. pp. 129-130, 131-132; see also Plan of Land dtd. 4/12/01.

83. In September 2006 Plaintiff was issued a Cease and Desist Order and Notice of Administrative Fine by the CRMC for his construction activities. See Pl.'s Depo. pp. 182-184; see also CRMC Cease & Desist Order & Notice of Admin. Fine dtd. 9/15/06 (attached hereto as **Exhibit P**).

84. The Cease and Desist Order was for improper "filling of coastal wetland" and because Plaintiff "altered, and failed to permanently demarcate, the required buffer zone." See CRMC Cease & Desist Order & Notice of Admin. Fine dtd. 9/15/06.

85. In response, Plaintiff was required to submit an "As-Built" Plan, drafted on January 29, 2007, to the CRMC to determine what remedial work needed to be done. See Pl.'s Depo. pp. 187-188; See also As-Built Plan for D. Ciampi (attached hereto as **Exhibit Q**).

86. The Plaintiff's construction placed gravel pea stone covering "the whole thing" of the eastern isolated wetland on his property, and an outdoor shower encroaching on the isolated wetland. See Pl.'s Depo. pp. 189-190; See also As-Built Plan for D. Ciampi.

87. The construction also exceeded the original footprint of the building without CRMC being advised, and Plaintiff constructed a wooden deck outside the buffer zone of the construction. See Pl.'s Depo. pp. 191-192; See also As-Built Plan for D. Ciampi.

88. Plaintiff received his occupancy permit for the home in July or August 2006.and he spends time at the home on weekends and during the summer. See Pl.'s Depo. p. 199.

89. Plaintiff was happy with the construction, feeling "the quality of it came out perfect." See

Pl.'s Depo. p. 201.

**The Subterranean Water Line**

90. In July, 2006, amidst construction of a home on his property, Plaintiff's contractor discovered a subterranean pipe while installing a fence post with a backhoe. See Pl.'s Depo. p. 139.

91. Paul Corina, the Superintendent of Utilities for Westerly, oversaw the Department responsible for water distribution in the Town. See P. Corina Depo. pp. 3-4 (attached hereto as **Exhibit R**).

92. The Water Department for the Town maintains a card system for every residential water service organized by date of installation. See P. Corina Depo. pp. 17-18.

93. For new construction, the Water Department requires the property owner seeking water service to run a water line from their basement to the property border, to hook into an existing service stop, or the Town would provide the water line from the water main pipe to the owners property border. See P. Corina Depo. pp. 20-21; 25.

94. The Water Department does not inspect the installation on private property, nor survey whether the water service lines are properly within the private property boundaries. See P. Corina Depo. pp. 23-24; 30-31.

95. The Property Owner is responsible for the repair and maintenance of water services lines on private property. See P. Corina Depo. p. 38.

96. The present practice today at the Water Department is to require proof of an easement where a water service line crosses another parcel of property in addition to the one it services. See P. Corina Depo. pp. 41-42.

97. The Water Department service location cards for the water service crossing Plaintiff's parcel at 486 Atlantic Avenue date from the 1950's, indicating the water service to the two rear properties of 484½ Atlantic Avenue and 4 Shore Gardens Road were installed in 1958 and 1959. See P. Corina Depo. pp. 18, 26-27; See also Water Service Cards, Water Service Diagram, and accompanying P. Corina note dtd. 11/28/06 (attached hereto as **Exhibit S**); See also Water Service Cards for 484 ½ Atlantic Ave dtd. 5/15/58 & 4 Shore Garden Road dtd. 4/16/59 (attached hereto as **Exhibit T**).

98. The water service diagram shows a service line running perpendicular to Atlantic Avenue providing water service to two residences owned by "Garofolo." See Water Service Cards, Water Service Diagram, and accompanying P. Corina note dtd. 11/28/06.

99. The Plaintiff does not know who installed the water line, nor does he have any basis to contest that a private contractor installed the water line. See Pl.'s Depo. p. 145.

100. The location of the water line did not effect the construction of the home, except for the one fence post that was dug. See Pl.'s Depo. p. 210.

101. Neither of Plaintiff's neighbors Mr. Henry or Mr. Dubreuil have easements for the use of Plaintiff's property for a water service line. See Pl.'s Depo. p. 146; See J. Henry Depo. pp. 48, 53.

102. Mr. Henry's understanding was that his water service line crossed underneath Plaintiff's property. See J. Henry Depo. pp. 51-53; 106.

**Plaintiff's Property Valuation**

103. Plaintiff purchased property for $90,000 by agreement in August 2000. See Pl.'s Depo. pp. 48-49.

104. Plaintiff estimates that an unimproved parcel of vacant land in the area of his home on Atlantic Avenue would sell for $600,000 to $700,000, "if not more." See Pl.'s Depo. p. 50.

105. The appraiser for Countrywide Home Loans valued the property as of September 2006 at $950,000. See Appraisal Report of G. Roch dtd. 9/22/06 (attached hereto as **Exhibit U**).

106. Plaintiff sought an abatement of his tax assessment for the property in September 2006, and submitted documents to the Tax Assessor showing the tax valuation of his land at $506,000 and his building at $251,400, for a total tax value of $757,400. See Pl.'s Depo. pp. 149-150; See also Chart of Abutting Property Owner Values dtd 9/20/06 (attached hereto as **V**).

107. Plaintiff did not dispute the tax valuation of the building at $251,400, which was made in July 2006 before the house was complete. See Pl.'s Depo. pp. 150-151.

108. Defendant's expert appraised property value at $1,150,000 as of February 2008. See Appraisal Report of Lenihan Appraisal Co. dtd. 2/21/08 (attached hereto as **Exhibit W**).

109. Defendant's expert opines that existence of drainage ditch "is typical of the area and it is believed to have existed prior to the construction of the current residence. It has no impact on the value of the subject property." See Appraisal Report of Lenihan Appraisal Co. dtd. 2/21/08 at p. 9.

110. Similarly, the expert appraisal report states "the presence of wetlands on the property is typical on the pond side of Atlantic Avenue and have existed naturally from the beginning. They have no impact on the current market value as compared to other properties in the immediate neighborhood. See Appraisal Report of Lenihan Appraisal Co. dtd. 2/21/08 at p. 9.

WHEREFORE, for those reasons set forth in the accompanying Motion for Summary Judgment and Memorandum of Law, the Defendants respectfully request that this Honorable Court grant their Motion for Summary Judgment as to all counts of Plaintiff's Complaint against them, together with costs and attorneys fees and such other relief this Court deems just and proper.

Respectfully submitted,

The Defendants,
By their attorneys,

**PIERCE, DAVIS & PERRITANO, LLP**

/s/ John J. Cloherty III

John J. Cloherty III, RI Bar No. 5068
90 Canal Street
Boston, MA 02114
(617) 350-0950

Rhode Island Office:
128 Dorrance St., Suite 400
Providence RI 02903
(866) 896-4901

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on August 11, 2008.

/s/ John J. Cloherty III

John J. Cloherty III