# EXHIBIT "A"

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

DAVID M. CIAMPI,
Plaintiff,

VS. C.A. NO. 07-256S

ETSUKO MOTOKI ZUCZEK, in her capacity as Finance Director of the Town of Westerly; PAUL CORINA, in his capacity as Superintendent of Water of the Town of Westerly, and PETER CHIARADIO, in his capacity as Superintendent of Public Works of the Town of Westerly,
Defendants.

DEPOSITION OF DAVID M. CIAMPI, the Plaintiff in the above-entitled cause, taken on behalf of the Defendants, before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Pierce, Davis & Perritano, LLP, 128 Dorrance Street, Providence, Rhode Island, on May 6, 2008, at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF:
ADLER POLLOCK & SHEEHAN, P.C.
BY: ELIZABETH MCDONOUGH NOONAN, ESQUIRE

FOR THE DEFENDANTS:
PIERCE, DAVIS & PERRITANO, LLP
BY: JOHN J. CLOHERTY, III, ESQUIRE

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

A. That is one of them. I have several.
Q. Why don't you, if you could, just identify what's in that three-ring binder that you brought with you today?
A. My notice of my deposition, notice of depositions called by counsel, my response to my interrogatories, information that I -- I had correspondence with my attorney, bills that I've incurred, copies of depositions, and maps.
Q. Thank you, sir. Other than reviewing the documents that you've described, did you speak to anyone about the content of your testimony here today in preparation for testifying, besides your attorneys?
A. No, sir.
Q. Are you on any medications today, sir, that would affect your memory or ability to recall events in the past?
A. No, sir.
Q. I would ask you a little background information, sir. Where do you presently live?
A. I reside at 19 Taft Point, Waterbury, Connecticut.
Q. And how long have you lived at that address for?
A. Since 2005, June.

Q. Did either of those latter two programs award any certificates or degrees?
A. No, they were a week or two week programs.
Q. The MBA program at Boston College, was that a full time program?
A. Yes, it was.
Q. Two years?
A. Yes.
Q. Now, any of those residential addresses that you provided, sir, did you own the property where you lived, or had you rented?
A. My wife owned in Chicago.
Q. What was the address of that home?
A. 420 South Clinton Avenue, Chicago, Illinois 60610.
Q. And were you on the title as well?
A. No, and it would be in her maiden name.
Q. And I'll ask you her name then?
A. Sharon, middle initial Ann, last name was Galas, G-a-l-a-s. And it was Unit 514.
Q. Now, other than that address, sir, have you owned any other property --
A. I do. I own another piece of property in Rhode Island.
MS. NOONAN: Let him finish the

question before you answer.

THE WITNESS: Okay.

Q. What's that other property?

A. 24 Kimball, K-i-m-b-a-l-l, Avenue.

Q. And where is that located?

A. Westerly, Rhode Island.

Q. How long have you owned that property for?

A. I purchased the land in 1997.

Q. Is that improved property?

A. There's a home on it. It was built in 1998.

Q. Do you still own that property today?

A. I do.

Q. Is it occupied?

A. I rent the property, so it's unoccupied.

Q. Is it a seasonal rental?

A. Yes.

Q. And where is Kimball Avenue in relation to Atlantic Avenue?

A. It is a street off of Atlantic Avenue. It runs -- the main drag is called Winnapaug, which drives in from Shore Road, and if you take -- at the end of Winnapaug if you took a right, it's about three or four roads down.

Q. Let me ask it this way, as far as in distance --

A. From Atlantic Avenue, it's a block from

weekend, so I would go for a run, or I would go for a bike ride.

Q. When you were visiting the property on Lawton Avenue, would you go for bike rides a lot?

A. Absolutely, yes.

Q. During those types of visits, had you ever had occasion to observe the, you know, the topography of the property or the amount of construction on the property?

MS. NOONAN: Objection.

A. On which property?

Q. Let me ask it this way, for how many years had you been familiar with the area of 486 Atlantic Avenue by walking or biking in that area? Was that something you've done over the course of many years?

A. No.

Q. Near 486 Atlantic Avenue is Winnapaug Pond; is that fair to say?

A. Yes.

Q. How long did you know that Winnapaug Pond existed in that area?

A. I've always seen it there.

Q. Can you describe the area between Winnapaug Pond and Atlantic Avenue?

MS. NOONAN: Objection.
A. It depends on, you know, where. I mean, if you go down toward the state beach, there's the very narrow strip, but the farther along you go, and if you looked at an aerial map, you could see it, there's more land.
Q. This is an ocean side area, correct, an ocean side community?
A. Yes.
Q. And on the one side of Atlantic Avenue is the Atlantic Ocean?
A. Yes.
Q. On the other side, in the vicinity of 486, is Winnapaug Pond?
A. Yes, but there's homes there as well.
Q. I'm just trying to establish the strip of Atlantic Avenue is between two bodies of water?
A. Yes. It's a barrier beach.
Q. A barrier beach?
A. Yes, it's a barrier beach.
Q. Are you aware of the existence of any salt marshes in the area of Atlantic Avenue?
MS. NOONAN: Objection.
A. I believe that Winnapaug Pond is a salt marsh.
Q. Before you had purchased the property at 486

Q. Is he someone that just had your number, and he would call you?
A. We've been in contact right along, especially with the development of this project, and we're continually in contact, so I don't recall how we started that relationship.
Q. You recall seeing an ad in the paper, though?
A. I do remember that. I do recall that.
Q. Did you maintain or keep a copy of that ad?
A. I did not.
Q. Was there a price quoted in the paper at the time that ad was run?
A. No.
Q. Do you remember what you did in response to seeing that ad in the paper for the property?
A. I believe I called Richard Cellico.
Q. And just to clarify who Richard is, is he affiliated with any realty or agency?
A. Yes, sir, he is.
Q. And what's the name of that?
A. Prudential Pequot, P-e-q-u-o-t, Properties, Watch Hill.
Q. And what was the next step you took after calling Richard Cellico?
A. I discussed the property with him, and then I

believe Richard and I drove to look at the property, or I met him at the property.
Q. Do you remember when that was, or what time of year it was?
A. I believe it was August of 2000.
Q. And can you describe what you saw when you went to the property with Richard Cellico that time?
A. There was a vacant lot. It was overgrown, poison ivy all over the property, sand.
Q. Was there any trees or brush on the property?
A. Cut or just -- some people were leaving some cut brush there, but the property was full of brush, and it was overgrown.
Q. Describe the vegetation growth. Was it at knee level, or was it something like there were trees?
A. Oh, no, it was probably waist level, knee to waist level. The deeper you went in, the higher the vegetation was. I think the highest that it was, though, would be my waist.
Q. Do you remember the topography of the property? Was it flat, or was it hilly?
MS. NOONAN: Objection.
A. It was flat.
Q. Do you remember how large a parcel of property was advertised?

A. I believe it was a little less than a quarter of an acre, and I believe that's what was advertised. I believe all the sizes of the lots are the same.
Q. What do you mean by that last comment?
A. All the sizes of the lots down there are pretty much they're cut the same. If you go in one area, they're 75 by 150, and these lots, I believe, are 70 by 150.
Q. And 70 feet by 150 feet?
A. Yes, sir.
Q. And when you were there with Mr. Cellico that first time looking at the property, what did you do physically at the site? Did you walk the property?
A. We did walk the property.
Q. And where did you walk?
A. We walked up and down Shore Gardens Road. We walked behind the property on Mr. Dubreuil's property to look at the back, and then we walked up an easement that Mr. Henry has, which is a driveway, and we walked into the property a little bit -- we were fearful of poison ivy -- probably 15 yards.
Q. And when you did walk into the property, from

the top line, on the first page, of May 12, 2000.
Do you see that, sir?
A. Yes, I do.
Q. Earlier you mentioned it was August of 2000 you went to the property. Does this refresh your recollection as to when you went?
A. It was August of 2000.
Q. Can you explain to me why he had obtained this, or, you know, why this is dated May 12th of 2000?
A. Maybe they listed the property.
Q. Did Mr. Cellico explain that to you at all?
A. No.
Q. Now, did you know who the owners were of the property?
THE WITNESS: Prior?
MR. CLOHERTY: Yes.
A. No, sir.
Q. Did you come to know them that day in August of 2000?
A. No, sir.
Q. Have you since learned who the owners of the property were?
A. Yes.
Q. And who were they?
A. The owners were Rose and Caroline Turco.

Q. Did you ever meet either Rose or Caroline Turco in person?
A. No, sir, I have not.
Q. Do you know if either are alive today?
A. I believe that Caroline has since passed, and I'm not sure about Rose. Caroline died in '03, January or February of '03.
Q. Did you ever speak to either Rose or Caroline Turco on the telephone?
A. No, sir, I did not.
Q. Did you ever have any written correspondence with them?
A. No, sir, I did not.
Q. Can you describe any communications you had through any other parties with the Turcos?
A. All communications went through their nephew, Anthony Turco of Danvers, Mass.
Q. Did you yourself ever speak to Mr. Turco personally?
A. Oh, yes.
Q. How frequently would you speak to him?
A. Quite frequently.
Q. And when was the first time you spoke to him?
A. The fall of 2000.
Q. And was this a discussion you initiated, or was it

him calling you?
A. No, I initiated the call.
Q. And why were you calling him?
A. At that point we had uncovered the drainage swale, and I contacted Mr. Turco to discuss knowledge, as well as to discuss an approach to resolution.
Q. I want to follow up on that in a minute. Sir, let me go back to this exhibit, if we could. After you visited that property in August of 2000, did you review this document, sir?
A. Oh, yes, absolutely.
Q. And why were you reviewing it?
A. Just to make sure there were no issues with the property.
Q. Now, did you notice on Page 2, Item 27, that deals with the flood plain? Do you see that, sir?
A. Yes.
Q. And it mentions, is the property located in a flood plain, and the answer yes is checked off?
A. Yes.
Q. Were you aware that it was located in a flood plain at the time?
A. All of the property is located in a flood plain down there, even my property on Kimball Avenue.

Q. Do you know what flood plain the 486 Atlantic Avenue property is located at?
A. I do, for insurance reasons. I believe it's A.
Q. And that's the most -- or can you describe what flood plain A is relative to the other flood plains?
A. I believe A is the second worst. AA is the worst. AA is right on the ocean, and I know that from actuarial reasons. So AA is on the ocean, and A is close to the ocean or on the salt pond or near the salt pond.
Q. Now, the next item on this is wetlands, and without reading it into the record in total, it appears to ask the owners to identify if there's any wetlands located on the property, and the box, don't know, is checked. Do you see that, sir?
A. Yes, I do.
Q. Do you remember reading that in and around August of 2000?
A. Yes, I do.
Q. Did that raise any concerns for you?
A. It did.
Q. And what concerns did it raise?
A. I wanted to know if there were any wetlands on the property.

Q. And what did you do to address those concerns?
A. I brought my engineer and a biologist.
Q. And when did you do that?
A. Very shortly thereafter, probably within a week of meeting with Mr. Cellico.
Q. So that would have been somewhere around the August, September time frame of 2000?
A. Yes, I think it was maybe Labor Day weekend.
Q. And who was your engineer and biologist that you brought in?
A. The engineer is Eugene, E-u-g-e-n-e, Spring, like the season. The biologist is Kathleen, K-a-t-h-l-e-e-n, Mangan, M-a-n-g-a-n.
Q. Now, you say you brought them in within a matter of weeks. What did you mean by that? You had them visit the property?
A. I met them at the property. We walked the property.
Q. And how is it that you had dealings with these two individuals before? Did they work on Kimball Avenue with you?
A. Mr. Spring worked on Kimball Avenue with me. He was reputable, he was fair, and he just was -- we had a very good rapport, so I trusted him and his opinion.

Q. And how is it that you knew the biologist, Miss Mangan?

A. Mr. Spring engaged her and her services. They had worked in the past on several other projects.

Q. So before this meeting, you hadn't dealt with her before?

A. No, sir, I had not.

Q. Why don't you describe what happened when you met at the property with your biologist and your engineer?

A. I believe we did it separately. I'm trying to recall. I do remember meeting Mr. Spring by himself. He had his fishing poles in his truck, I remember that. He drove up. It was twilight. He was going to be going fishing. We walked the property. It was still light out. We walked the perimeter of the property, and we talked about it. He said he saw a couple of cattails, which is the sign of wetlands, in the rear of the property. And he thought that we would need to engage Kathy because of the vicinity of Coastal features. He had indicated that those cattails looked like freshwater rather than saltwater, but we still needed to engage Kathy because it fell under Coastal Resources Management Council jurisdiction.

Q. And how long was that visit at the property first with Mr. Spring?
A. Maybe 15 or 20 minutes.
Q. Did you or Mr. Spring enter onto the property?
A. Oh, we walked. We were concerned about the poison ivy again. Both of us were wearing shorts.
Q. I guess my question to you is, did you go into the property?
A. We did. Probably the same as we did with Mr. Cellico, probably 15, 20 yards.
Q. From where did you enter the property?
A. From Atlantic Avenue, and also we entered from Shore Gardens Road.
Q. Other than noticing the cattails, did you notice any other unusual terrain features or vegetation?
A. No, sir, we did not.
Q. The comment about them looking like freshwater cattails, was that something that he volunteered to you?
A. He did.
Q. Do you today know that there is any distinction between freshwater and saltwater cattails?
A. I don't. He deals with this all day long. I don't have the expertise in that.
Q. Do you remember thereafter meeting with

Q. Do you remember the advertised price for the parcel?
A. I think it was $105,000 or $109,000.
Q. And do you remember what your initial offer was on the parcel?
A. Maybe ninety five or ninety nine thousand.
Q. And was that offer communicated in a written --
A. It was. There was a purchase and sales -- not a purchase and sales. An offer agreement was written by Mr. Cellico in his office.
Q. Did you maintain copies of that offer to purchase?
A. I don't know if I have those.
Q. Do you know how soon after you met with Mr. Cellico that first time at the property that you made this offer to purchase?
A. Within a week or two.
Q. Was there any contingencies in that written offer to purchase?
A. Attorney review and biologist review and approval of a septic system, DEM approval and CRMC approval.
Q. And you mentioned that you had provided a check; was that a down payment for purchase?
A. Yes, sir, it was.
Q. Do you remember how much your down payment was?

A. I believe it was either $500 or $1,000.
Q. Did the owners -- was there any negotiation back and forth as to the purchase price?
A. I believe that there was because I needed to do the approvals, obtain the approvals myself.
Q. Did you negotiate any discount for the purchase of the property because you would have to go through this approval process?
A. I believe I did. I believe I think we ended up with a number of $90,000.
Q. Now, before you extended an offer to purchase this property, had you been looking at other properties along Atlantic Avenue for purchase?
A. I mean, occasionally I looked at signs that went up and looked at lots. I was trying to find a home for my family so that I had something, because the other property on Kimball was going to be exclusively rental.
Q. That was my next question. Why was it that that other property was going to be exclusively rental?
A. I wanted to be near the beach. I wanted to be closer to the beach. I had a young family. I didn't have a family at that point, but I was hoping that I would have a family that I could just cross the beach, and it would be very

convenient, rather than walking one or two blocks to the water.
Q. The other occasions where you looked at signs and lots along Atlantic Avenue, did you get a sense of what an unimproved parcel along Atlantic Avenue would cost?
A. Yes.
Q. And what was your sense, around the time of August 2000, how much a parcel like that would go for?
A. Same, around 100, 110, $120,000.
Q. Do you know today how much an unimproved parcel in that area would go for?
A. Probably six or seven hundred thousand, if not more.
Q. Today it's a hot area to purchase property in?
A. It is.
Q. You got in at a good time, apparently. When your biologist consultant told you it was a provable lot, in other words, when she told you that it was somewhere you could build on, did she tell you any other limitations on the property as to what could or could not be built there?
A. She really didn't know. She needed to go in and do a study or an analysis, and that's when

design.
Q. When you say design, what do you mean? Design for the home?
A. A septic system design, as well as an application for CRMC.
Q. And just to clarify, CRMC is the Coastal Resources Management Council?
A. Yes, sir.
Q. And what was your understanding of why you needed to make an application with them?
A. Because it's any jurisdiction or any property that is, I believe, south of Shore Road falls under Coastal Resources Management Council jurisdiction.
Q. And their jurisdiction oversees the installation of septic systems?
A. No. Coastal Resources Management Council is due to any wetlands on the property or any vegetation or the fact that, you know, it sits within that area. And I think that predominantly it sits between Shore Road and the Atlantic Ocean, so it falls under their jurisdiction. Any property that needs to be developed has to have an application.
Q. And that last bit is what I wanted to clarified,

they control any construction in those areas?
A. Yes, sir.
Q. And their control is not limited to just septic; it's any construction?
A. Yes, sir. Actually, they don't have anything to do with the septic system.
Q. Who approves the septic system?
A. Department of Environmental Management.
Q. And that's a state department, correct?
A. Yes. Both agencies are state.
Q. So your plan, upon first considering the purchase of the property, was to research the town records for easements, to survey and stake the property, to do a biology analysis for wetlands, and then to have Mr. Spring design a septic system?
A. And to put two applications together, one for DEM and one for CRMC, and to submit those.
Q. Was this plan developed after you had made the offer to purchase or before?
A. After.
Q. And how soon after the offer to purchase had you made this plan?
A. After it was accepted, and then it went to purchase and sale.
Q. And how soon after your offer to purchase was the

offer accepted?
A. Probably maybe a week, back and forth.
Q. And you did a formal Purchase & Sale Agreement?
A. I did.
Q. Did you save a copy of that Purchase & Sale Agreement?
A. If I did, my attorney has it, or it would have been provided.
MR. CLOHERTY: Beth, do you know if that has been provided?
MS. NOONAN: I don't know positively. I don't have the documents with me today.
Q. And did that Purchase & Sale Agreement also have the contingencies in it that you also earlier described?
A. Yes, sir. Those were more formally spelled out by the attorney.
Q. And who was your real estate attorney at the time?
A. John Gentile, G-e-n-t-i-l-e, Main Street, Westerly.
Q. Is it fair to say, sir, that at the time you first looked at the property with Mr. Spring, you understood that there may be wetlands on your property or on the property that you were considering purchasing?

A. Yes.
Q. And you later, after making the offer to purchase, retained a biologist to confirm whether or not there were wetlands on the property?
A. When Mr. Spring and I met, and when Miss Mangan went on the property to clarify, there was an assumption that there were very small limited areas of wetlands on the property. There was actually one isolated area, and that's what she quoted. I remember the conversation, isolated freshwater wetlands, is the quote that she used.
Q. And when did she give you that quote?
A. After she looked at the property. She said there was a pocket. That's what it was, a pocket of isolated freshwater wetlands.
Q. And did she tell you how she made this determination?
A. I believe that she saw cattails.
Q. Did she physically -- did she tell you she physically went on the property?
A. She did.
Q. Were you there when she did so?
A. I don't recall. As I said, I've met with her several times there.
Q. And how soon after you had first visited that

underneath that or to the south of that rounded corner. Do you own that property just south of that arc, or does your property only extend to that arc?
A. I'm assuming it's just the arc.
Q. Now, you had mentioned earlier that you had identified the drainage swale at some point in time. Do you remember when that drainage swale was first identified?
A. Actually, Mr. Spring called me, and this was in the fall. I was in Maryland on business, and he called me. I left him a message for a status. They were doing some work on the property, him and his wife, and his wife's name is Carol Spring, and they uncovered -- he said, "Were you aware that there was a drainage ditch or a drainage swale on the property?" And I said, "What do you mean?" He said, "Well, I uncovered that there's a swale that's being used for drainage underneath the brush and poison ivy."
Q. And what did you respond when he told you this?
A. I said I had no idea.
Q. And do you remember when this was phone call took place?
A. It was while -- it was after the survey was

done, and he was laying out the work for the septic system and how the house was going to sit for both DEM and CRMC, and it had to be probably the October, November time frame.

Q. And that's of 2000?

A. Yes, sir.

Q. What does Mr. Spring's wife do? Is she an engineer, too?

A. No, she just helps him out. She will hold the stick for him when he has to shoot.

Q. As a result of being advised of this by Mr. Spring, what, if anything, did you do?

A. I contacted the real estate agent and asked him to get in contact with the owners. I also contacted my attorney and asked him, you know, what steps I should take.

Q. And I don't want to know the discussions with your attorney, but which attorney were you speaking with at that time?

A. John Gentile.

Q. And why was it that this drainage swale, that you were advised of by Mr. Spring, was a concern to you?

A. Because it was draining water from Atlantic Avenue onto the property.

from coast to coast, but I do think the first visit that I made back in was within a week or two, I did go down and take a look at it, and it was underneath poison ivy and overgrown brush. I remember getting a stick and lifting it up to see it.

Q. And what were you able to observe?

A. There was a little swale (indicating).

Q. And you're gesturing with your hand in a curved motion, but the record won't reflect that. Can you describe it in words?

A. I'm sorry. It was probably maybe two feet, three feet wide by a foot and a half, two feet deep, and it started probably -- it appeared that the street was pitched towards it, and then it kind of was flat, and then it dropped.

Q. And when you say it was flat and dropped, that's as you were traveling away from Atlantic Avenue?

A. If I'm going into the property from Atlantic Avenue, it was flat, and there was a little pitch from the road, and it was kind of like a V shape, and then it was flat, and then it was flat probably for five, six feet, and then it dropped into a hole, which was a foot, foot and a half, and then it progressively got deeper and wider.

Q. The composition of this swale, was it grassy, gravel? Is there any way you can describe it?
A. It was just -- it was mud. There was maybe a little bit of maybe soil. There was no crushed stone. There was no -- it appeared that nobody -- it was like somebody ran in and roughshod it. There was no plan to it. It was just thrown together.
Q. You mentioned it looked like somebody ran in and roughshod it; how do you know this swale wasn't naturally occurring runoff from water?
A. You could see the way the terrain was, that somebody had gone in.
Q. What evidence did you see of that, sir?
A. I just saw the way that it was shaped. I mean, it was a natural shape -- not a natural shape, but, I mean, it looked like somebody had gone back many years and kind of had cut something out, and then it kind of had just overgrown with shrubbery and vines.
Q. Now, where the drainage swale meets Atlantic Avenue, do you know if that was within the boundaries of your property, sir?
A. I believe it's on Mr. McGrath's property, Terrence McGrath, T-e-r-r-a-n-c-e, McGrath, M-c.

Q. And that's Mr. McGrath's property which immediately abuts the 486 Atlantic Avenue property?
A. Yes, sir.
Q. Did you know at the time this was first pointed out to you that it was on Mr. McGrath's property and not on 486 Atlantic Avenue?
THE WITNESS: The beginning of the swale?
MR. CLOHERTY: Yes.
A. I think we never really had a clear definition as to whose property it was on.
Q. Did the swale continue so that it entered onto the 486 Atlantic Avenue property?
A. Absolutely did.
Q. Do you know how much of a distance it continued before it entered onto 486 Atlantic Avenue?
A. I would assume -- did I know then? Or do I know now?
Q. Let me ask you then, did you know how long it continued?
A. Again, everything was covered.
Q. Did you later learn the distance, sir?
A. Yes.
Q. And what did you learn?

spoke to the property owners?
A. They had no knowledge. They had no awareness of any of the drainage issues that existed.
Q. And what was your response upon learning that they had no knowledge of the drainage issues?
A. I mean, I asked Mr. Cellico for clarification. I asked him to make sure that there was no issues with the property, and at that point we kind of tried to work through a plan as to how we were going to salvage the work that was already done.
Q. Did you ever discuss withdrawing from the Purchase & Sale Agreement based on this previously undisclosed condition?
A. I had contemplated it.
Q. Did you speak to Mr. Cellico about that possibility?
A. Well, if we didn't get the lot approved, yes.
Q. What was your conversation with Mr. Cellico about your ability to withdraw from the Purchase & Sale Agreement based on this drainage swale?
A. I said try to get the lot approved.
Q. So you decided to go forward to seek approval, even though you knew the drainage swale existed?
MS. NOONAN: Objection.
A. We had spoken to the owner, and the owner was

resolution.
Q. Do you know if that application was ever filed with CRMC?
A. You know, I'm not a hundred percent confident. I think what happened was they did forward it over there, and I remember having -- I drove up there and had a conversation with some folks at Coastal Resources, and, you know, we had this issue, and we said, "How are we going to handle it?" And they said, "There's no possible way that we're going to allow you to fill this drainage swale." So I think the application became moot.
Q. And when were you told that there was no way they would allow you to fill the drainage swale?
A. We put in an initial application, which was denied, and that was in December.
Q. And that's '00, 2000?
A. Yeah, I think it was December of 2000. And then I think the second round, before we submitted it, my approach was, let's sit down with the permitting agencies to understand what they would allow and what parameters. And at that point we had discovered and had enough information so that we knew what we were getting ourselves into from the land perspective, as to where the drainage

would send them.

MR. CLOHERTY: Yeah, we went through the time and expense of making them for you.

MS. NOONAN: They're either sitting in your file, or I will have Adam double check it.

MR. CLOHERTY: Why don't we go off the record. I don't want to muddy up the record.

(OFF THE RECORD)

MR. CLOHERTY: Why don't we do this, sir, and just so we're clear on the record, counsel, I am fully agreeing to provide color copies to you if they haven't been provided to you already.

MS. NOONAN: Of the photos that are now part of Exhibit D?

MR. CLOHERTY: Yes.

Q. Because I don't have additional color copies to mark as an exhibit, sir, I'm going to reference the ones that we have in our original file, and they correspond to the ones that have been produced and marked as Exhibit Number D. Showing you the first photocopy of a photograph. It's labeled, at the bottom of the photograph, Middle. Do you see that, sir?

A. I do.

Q. Why don't you turn the page. The next one is labeled End at the bottom of the Polaroid. Do you see that?

A. I do.

Q. And the next one is labeled Road, at the bottom of the photograph. Do you see that, sir?

A. I do.

Q. Looking at that color photocopy of the photograph labeled Road, does that fairly and accurately depict the beginning of the drainage swale as it appeared in November of 2001?

A. It does. It looks like somebody took the picture from some heights, so you're able to see a little bit of the contour but, yes, it does depict it.

Q. And earlier I asked you some questions about a decorative half barrel, and that appears to be depicted in the upper left-hand corner of this Polaroid photograph?

A. I see that.

Q. Is the location of the decorative barrel still at the corner of the Atlantic Avenue property today?

A. Yes.

Q. Is the drainage swale relatively -- does it exist relative in proximity, the same proximity depicted

here in this photograph?
A. It looks about the same.
Q. Is that how the drainage swale looked when you first noticed it on the property, sir?
A. No.
Q. What was different?
A. There was vegetation that was overgrown, and you couldn't see it. It looks like this is in either the winter or the fall, because this is all dead (indicating).
Q. The grassy area appears to be all brown; is that correct?
A. Yes.
Q. Why don't we go to the previous photograph marked --
A. End.
Q. -- End. Do you recognize anything depicted in this photograph, sir?
A. I notice Mr. Henry's house and the flag pole.
Q. There appears to be a vehicle, also, parked there in the upper left-hand corner?
A. Yes.
Q. Do you recognize that vehicle?
A. I don't.
Q. Does this depict how the drainage swale looked in

and around November of 2001, to your knowledge?
A. You know, I don't recall, but it appears to be, you know, accurate at that point.
Q. It also appears to reflect kind of a high grassy area or a high growth of grass in that area, unlike the first photograph that we looked at which was more trimmed grass. Let me know if that's not an accurate description?
A. No, I don't believe so. I believe it's just overgrown. It looks like it was wet, so it looks like the water just seeped out.
Q. And you're referring to --
A. The third by-the-road photo, and then the second photo looks like it was higher, but it looks like the water just was dissipating into the ground.
Q. Why don't we identify, if we could, the first photograph that's labeled Middle. Do you recognize what's depicted in that photograph?
A. This is the McGrath's property, the easement that goes to Mr. Henry's house, and this looks like it's from facing Atlantic Avenue.
Q. So in this photograph, the right side of the photograph is the McGrath's property, and the left side of the photograph is the 486 property?

A. Yes, sir.
Q. Does that fairly and accurately depict the drainage swale as it looked in November of 2001 in the middle?
A. Again, I can't recall at that specific time.
Q. Was that how it looked when you first went on the property in August of 2000?
A. Absolutely not.
Q. And how about when you first were told about the drainage swale and went to investigate it?
A. Again, these trees were full, so I got a stick and pulled them over in order to see what was under there. It was muddy like that (indicating).
Q. There appears to be, and correct me if I'm wrong, some kind of gravel or stone base at the bottom of that? Is that not accurate?
A. No, there's no stone there. It's all sea grass -- I'm sorry, sand and a little bit of muck from, I'm not sure what, but mud or sand.
Q. Now, going back to your testimony about CRMC advising you there's no way you can fill in that drainage swale, do you remember when that advice or that statement was made to you?
A. It was after this application, that's for sure, so it had to be after November of 2001. I think

it was probably in the spring. I remember going up there. I remember meeting with two folks from the agency.

Q. And who did you meet with?

A. I believe it was Tim Mott and Dave Reis.

Q. I didn't catch the first name?

A. Tim Mott, M-o-t-t, and David Reis, R-e-i-s.

Q. Do you remember if either one of those were the persons who told you you couldn't fill in the drainage swale?

A. Yeah, I remember point blank them saying there's no way that they're going to allow us to fill anything on a barrier beach.

Q. And I'm trying to identify the speaker who made that statement. Was it both of them?

A. It was both of them, yeah, I'm sorry.

Q. Did they explain a reason why that was not permissible, to fill in on a barrier beach?

A. Because it would ruin the natural landscape of the land, and that the birds may be using that water to feed, pretty much that type of discussion.

Q. Did you have any dialogue with them about the fact that this drainage ditch may not have been a naturally occurring drainage swale?

A. Absolutely.
Q. And when you advised them that it was not naturally occurring, what was their response?
A. They were aware of that, because they had already had the application from the Town of Westerly.
Q. The fact that they had been advised the Town of Westerly had created the drainage swale didn't alter their conclusions?
A. No, sir.
Q. Did they give you an explanation as to why not?
A. They weren't going to change their mind. It was a barrier beach. They were not going to fill it, and it was part of the environment.
Q. After that discussion with these representatives of CRMC, have you made any further efforts to get authorization or permission to fill in that drainage swale?
A. I've had some discussions, but nothing eminent.
Q. And who is it that you've spoken to about efforts to fill in the drainage swale?
A. I spoke to Mr. Spring, Eugene Spring, who is the engineer. I spoke to Miss Kathleen Mangan, Scott Rabideau, and various individuals from Coastal Resources.

anyway. Mr. Henry, what conversations did you have with him about the drainage ditch?
A. I asked him if he had any knowledge of it. I asked him if he had seen any work done on the property. I had asked him if potentially he had done any work on the property.
Q. And what did you learn from speaking to Mr. Henry?
A. He had indicated none. He believed that the Town of Westerly had went on the property and done some work on it.
Q. Did he ever tell you that -- or did you ever speak to him about how long that drainage swale had been in existence for?
A. I had.
Q. And what did you learn?
A. He didn't give me a specific time frame.
Q. What was the nature of your conversation about the existence or how long it had existed?
A. I just asked how long he remembered it, and he didn't really give a specific time frame.
Q. Did he mention to you that he had seen it since he was a child and played in that area when he was a child?
A. No, he did not.
Q. Do you remember ever asserting or suggesting that

Mr. Henry was the one who had gone onto the property and modified the drainage swale?

A. In -- it was May of '05, construction, 20 percent of the house was done, and somebody had gone on the property with some sort of Kubota excavator and done some major excavation, increasing the size of those pictures that you had shown me by three or four fold, and I had asked Mr. Henry if he was involved in that, or if he knew anybody that was.

Q. And what did he tell you?

A. He had indicated no. I communicated with Mr. Henry that I was adamant about filling that drainage swale, and Mr. Henry said over his dead body; he never wanted that drainage swale filled.

Q. Did he tell you why?

A. Because he needed -- the water would sit in front of his driveway if it wasn't there.

Q. What is your relationship today with your neighbor Mr. Henry?

A. It's cordial.

Q. Was this a source of friction between the two of you?

A. I believe it is.

Q. Do you ever socialize with Mr. Henry?

A. Yes.
Q. Did you receive a copy of that letter when it had gone out?
A. I do not recall.
Q. Do you remember seeing it before today?
A. I did see this, yes.
Q. And in there, in the first paragraph at least, there's a suggestion that he had gone onto the property and modified the drainage swale. Do you see that, sir?
A. I do.
Q. Did this letter go out before or after you had spoken to Mr. Henry?
A. I believe it went out after.
Q. Did you question whether Mr. Henry was truthful when he told you he hadn't gone onto your property and modified the drainage swale?
MS. NOONAN: Objection.
A. Just something didn't add up, so I wasn't sure if he was part of it, or he had more knowledge, and he was so adamant about keeping that drainage swale.
Q. Did you later learn from any source who had modified the drainage swale?
A. There was never a conclusion. There was

assumptions. There was never a conclusion.
Q. Today do you still have suspicion that Mr. Henry was the one that had gone on the property and modified the drainage swale?
A. Based upon the size and the depth of the property when it was done, it had to be somebody that had a piece of heavy equipment.
Q. Do you know that Mr. Henry has access to heavy equipment?
A. I do not know.
Q. Since we have it out, why don't I show you the next exhibit. It was previously marked as Exhibit Number 5 from the Henry deposition. Take a moment and tell me if you recognize it?
A. I do.
Q. What do you recognize that to be?
A. It's a letter from Michael Lynch to Jeffrey Henry.
Q. And the date on that letter?
A. August 21, 2006.
Q. And that involves a notice to Mr. Henry not to -- to do what, sir? What's the subject matter of that letter?
A. Cutting grass on the property in the wetlands on 486 Atlantic Avenue and parking on the

the major change in the swale. This was probably a couple of weeks before. It was probably late April, early May, and then I spoke to him -- we flew home. We said good-bye to the McGraths, back to Chicago, and then we came back a week or two later, and we noticed that the major excavation was done to the property, and at that point I put no trespassing signs along my property.

Q. I just want to clarify, you mentioned a major excavation or major change to the drainage swale. Can you put a date on that as to when that took place?

A. May '05, before Memorial Day.

Q. And at that time you had -- your construction was ongoing on your property?

A. Yes, sir, it was.

Q. Did you ever speak to any of your contractors about whether they did the work?

A. I did.

Q. And who did you speak to?

A. I spoke to Peter Peloquin, two of the framers, and the excavator.

Q. And what did they tell you?

A. They communicated that they had not done any of the excavation, and they had no knowledge or were

aware of any of the work that was done.
Q. Did you have an excavator yourself on site at the time?
A. They had done the initial excavation of the property. They had put the silt fence up, and they just cleared the bush around where that silt fence was, and that's all they were allowed to touch.
Q. Did they have any heavy equipment for doing the work?
A. They did.
Q. Backhoes and that type of thing?
A. Yes, they did.
Q. Who is the contractor that did that work?
A. Mr. Russo, Robbie Russo.
Q. And what was his company name?
A. R.J. Russo Excavating, Inc.
Q. And for that name you were looking at Exhibit Number B?
A. That's correct.
Q. Did Mr. Russo have to excavate any property for the -- any portion of the property for the concrete slab for the building?
A. The concrete slab was done after the fact.
Q. So at the time of that major excavation of the

related to the purchase of 486 Atlantic Avenue?
A. It is.
Q. And that reflects a purchase price, on the third page, of $90,000, the contract price, the top number on the right-hand side?
A. Yes.
Q. Is that consistent with your memory of how much you paid for the property?
A. Actually, it was $99,045, because there was settlement charges to the borrower.
Q. But the contract --
A. The contract sale price was 90.
Q. Thank you, sir. I'm going to show you some other documents, sir.
MR. CLOHERTY: Why don't we have this marked next.
(DEFENDANTS' EXHIBIT G MARKED FOR IDENTIFICATION)
Q. Showing you what has been marked as Exhibit Number G to your deposition. It's a two-page document. Tell me if you recognize what it is?
A. I do.
Q. What do you recognize it to be?
A. I believe it's the tax map or the plot map for -- map 155 for where 486 Atlantic Avenue resides, and then there's a blown-up version, and

then the sketch that was drawn by Mr. Commeau.
Q. Focusing your attention on the first two pages, sir, that plot plan map, is that obtained from a town document?
A. I believe it was.
Q. Did you obtain that copy yourself, or did somebody get that besides yourself?
A. I believe I had a copy of it. I believe the realtor had a copy of it, and I believe Mr. Spring had a copy of it.
Q. Now, your lot, do you know which lot number you own, sir?
A. 65.
Q. And it appears from this plot map on the -- you can keep it oriented that way (indicating). On the top of the plot map there's a label for Winnapaug Pond. Do you see that, sir?
A. I do.
Q. And that would be to the north of your property, sir? I don't know if there's a north, south on here.
A. South would be this way (indicating). Yes.
Q. And the ocean would be on the south side, the bottom of this map, correct?
A. Correct.

Q. Now, all of these plots behind your property towards Winnapaug Pond, are they in existence in reality, sir?

MS. NOONAN: Objection.

Q. Have any of those lots been developed?

MS. NOONAN: Objection.

A. This plot, yes (indicating).

Q. You have to tell me the label?

A. Number 66, Number 67, 143, 142, and 126, 127, 128, and 129 is a building lot -- two building lots are for sale.

Q. And just focusing on those ones on the pond side, the 126 through 129?

A. Yes.

Q. Is there any improvements on that parcel?

A. Not as yet. It's for sale.

Q. These roads that are depicted here behind your property, do they exist on the ground?

MS. NOONAN: Objection.

A. Shore Gardens Road does exist, and this road does exist (indicating).

Q. And when you point to this road?

A. It's right next to lot -- between lot 58 and lot 55.

Q. Is there a name for that road, sir?

A. I wouldn't know.
Q. Earlier I asked you if this was a salt marsh area. Do you know if the area that's labeled 148, right here to the east of your property, is a salt marsh?
A. I believe that it is.
(DEFENDANTS' EXHIBIT H MARKED FOR IDENTIFICATION)
Q. Showing you, sir, what's been marked as Exhibit Number H for your deposition. Take a moment to look at it, and tell me if you recognize it?
A. I do.
Q. What do you recognize that to be?
A. This is one of the applications for ISDS for permitting that was submitted by Mr. Spring and Miss Mangan to the Department of Environmental Management.
Q. And it's, to describe it, is it fair to say that's a plot plan, sir, or a plan of land?
A. Yes, it is.
Q. And there is a stamped date in the lower right-hand corner of April 21, 2001. Do you see that, sir?
A. April 12, 2001.
Q. I'm sorry, April 12th?
A. Yes.

Q. Is that consistent with your memory as to when this plot plan was created?
A. This was one of them, yes.
Q. The description of the proposed building in the middle of the plot plan is what, sir?
A. Three bedroom house on piles.
Q. Was that the original intention, that it be a three-bedroom house?
A. Yes, sir.
Q. Did that get changed at some point in time?
A. Part of our negotiations, that we discussed earlier, with the Town of Westerly, we -- not the Town of Westerly, with Coastal Resources and DEM, is that we would reduce the size -- actually, it was DEM only. We would reduce the size of the house for a two bedroom in order to accommodate the septic system.
Q. And was that, in fact, done? Was the house constructed as a two bedroom instead of a three bedroom?
A. Yes, sir, it was.
Q. Did DEM say why they wanted it a two bedroom as opposed to a three bedroom?
A. I believe it would be usage of the septic system and the amount of gray water.

Q. To your knowledge, do septic regulations under DEM have size requirements for the size of a septic system based on the number of bedrooms?

THE WITNESS: The size of the tank?

MR. CLOHERTY: Yes.

A. I believe they do.

Q. So is reducing the size of the bedrooms a way to use a smaller tank for the property?

MS. NOONAN: Objection.

A. I really -- I'm not sure, but I'm assuming that it has a smaller print, sand filler.

Q. Now, also on this diagram, there's a note along a linear line that's drawn on the left-hand side?

A. Yes.

Q. I believe it says existing manmade ditch. Do you see that, sir?

A. I do.

Q. Does that depict where the layout of the drainage swale was at the time in 2001?

A. Yes, it does.

Q. Is that the way the drainage swale is today, sir?

A. Yes, it is.

Q. Now, earlier you talked about there being a major excavation of the drainage swale in May of '05?

A. That's correct.

curved in either direction from the center of the roadway; is that the case for this roadway?
A. I'm not a hundred percent confident. I don't believe that it is.
Q. Have you done any measurements of the pitch, sir?
A. No, but I could see it delineated, and there is definitely a pitch so that it goes right into the hole or the beginning of the swale, and it would be opposite of a concave. It would be like a V shape.
Q. Is that the way the roadway looked immediately upon its completion, or has it become that way over time due to water runoff?
A. It's asphalt, so I don't know if the water would have created that V, I'm not sure, but it appears that it's pitched toward the drainage swale.
Q. Now, on this diagram there's also delineation of two areas labeled isolated coastal wetlands. One is a triangular area at the top, and the other one is kind of a pentagon shaped area on the eastern side of the property. Do you see those two marks, sir?
A. I do.
Q. Can you describe what those two areas depict on

your property?
A. First of all, to describe the northern -- in the northwest corner, there's a triangle shape, and that's where the water from the area subject to storm flow or drainage ditch drops or ends, and that was wetlands that was created, our assumption is, based upon the drainage swale.
Q. Now, in that area of wetlands, is it a grassy area with marsh?
A. It's brush, just brush.
Q. Is there any standing water, like a pond, there?
A. Only when there's a heavy rainstorm will it sit for a day or two, and then it dissipates into the ground.
Q. And the other -- before we move on, is there any further description you can give of that triangular-shaped area on the northern part of your property?
A. No.
Q. What about the other shaped area on the eastern part of your property?
A. That is an isolated coastal wetlands that was, I believe, created from water that resides on Shore Gardens Road. There's a large pothole where the water would dissipate and flow off into the

property.
Q. And what leads you to believe that that's the cause of that?
A. It was parallel to the hole.
Q. Did Miss Mangan or anyone else advise you that she thought that was the source of the wetlands on that property?
A. They didn't really assume.
Q. Is there any standing water in that part of the property?
A. No, sir.
Q. And what does it consist of, just grassy area?
A. Just grassy vegetation.
Q. Have both of those areas been marked as wetlands by someone?
A. Kathleen Mangan.
Q. What did Kathleen Mangan do to mark them as wetlands?
A. She flagged them.
Q. And do I take it that means she physically stuck a flag in the ground where they were?
A. She physically ties a flag to the area of wetlands on all three areas. Mr. Spring then comes in, and he plots it on the map, as you can see here on Exhibit H.

Q. So on this diagram where there's a triangle symbol for a marker, is there an actual flag on the ground on the property?

A. Not now. There was at that time. 1A was a pink flag, and pink is for wetlands, and it was on each of the areas.

Q. Did anyone from CRMC ever come in and endorse or adopt those markings as accurate? I mean, did someone else come on the property and revaluate?

A. No, I believe based on Miss Mangan's professional stature in the community, they assumed that she did a professional job, and that was it.

Q. So CRMC accepted her designation of what was wetlands?

A. Yes.

Q. Is there anything else on that diagram you want to point out, sir?

A. No. I'm just looking at it.

Q. On the eastern side of the diagram opposite Shore Gardens Road, there's a line that's noted, edge of coastal vegetation, I believe it's supposed to say. Do you see that?

A. That's correct.

Q. What does that depict, as far as you understand?

Q. Physically on the ground, was part of the driveway over the corner of your property?

A. I believe over time it has grown that way.

Q. And have you taken any steps to reclaim that part of your property?

A. I have. A post has been put on the corner, and also Mr. Naccarato and Mr. --

Q. Lynch?

A. Lynch, thank you. Have communicated with Mr. Henry that that property does, in fact, belong to me.

Q. Was this the property that he was cutting the lawn on that you described before?

A. He was cutting it all along the entire area of the property line, including the drainage swale, and I'm pointing to Exhibit H within the property line, the drainage swale, all the way through to about 60 percent of the exhibit, where it says ASSF 3A.

Q. Now, this diagram shows some setback requirements. Do you see those, sir?

A. I do, 15 feet, and I believe there was a 30 feet from the front of the property.

Q. And in the rear there's a 30 --

A. 30, correct.

Q. -- 30-foot rear zoning setback?
A. Correct.
Q. And on the eastern edge it appears to be a 12 1/2 foot setback; is that correct?
A. Yes.
Q. What's your understanding of why there's a different setback on this side versus a 15-foot on the other side?
A. I do not know.
Q. What's your understanding of what the impact on your use of the property is because of these setback requirements?
A. That would be mostly from the building perspective, that would be the only requirement, that I couldn't build in those areas.
Q. You couldn't construct any livable areas in those setbacks?
A. That's correct.
(DEFENDANTS' EXHIBIT I MARKED FOR IDENTIFICATION)
Q. Showing you, sir, what has been marked as Exhibit Number I, and I'd ask you to take a moment to look at that, and tell me if you recognize that?
A. I do.
Q. What do you recognize that to be?
A. It's a letter that I sent to Mr. Fusaro.

Q. It appears to be a photocopy of that plot plan that we were just describing as Exhibit Number H, together with some handwriting at the bottom; is that correct?
A. Yes.
Q. And that's your handwriting at the bottom, sir?
A. Yes, it is.
Q. Is that dated, sir?
A. I do not see a date on here.
Q. Why was it that you were sending this to Mr. Fusaro?
A. I asked him if he could provide me with some information that he could provide to me, and I asked him to contact me.
Q. And you were seeking information concerning what, sir?
A. The drainage ditch and the drainage swale.
Q. Now, we looked at Exhibit Number H earlier, and there was this date stamp at the lower right-hand corner of April 12, 2001. Do you know if this document, the plot plan, had been created before that at some point?
A. The plot plan was created in 2000. I believe it was December of 2000, and just for clarification, that's a 22 1/2 feet setback.

MR. CLOHERTY: Oh, I'm sorry.
A. That's okay. I just read it here.
Q. So the copy in Exhibit H of the eastern most setback is 22 1/2, not 12 1/2 feet, as we previously said?
A. Yes.
Q. Now, did Mr. Fusaro respond to your request for information about the drainage?
A. I don't believe that he did this to me. I believe he spoke directly to Mr. Turco.
Q. Was that the first time you had communicated with Mr. Fusaro about the drainage?
A. No, I believe I had a subsequent phone conversation with him.
Q. I'm asking if you had a prior?
A. I'm sorry, a previous phone conversation, no. I had a conversation with him after that. This was the initial letter that I sent to him, and I'm not sure if I faxed it or if I mailed it to him.
Q. But either way, we're talking about in the December 2000 or early 2001 time frame?
A. Right, and the way we would know that is the permit 2000-11-29.
Q. So there's handwriting there about what the permit number is?

did my biologist.
Q. Did you later come to learn that there was a subterranean water line, sir?
A. Absolutely did.
Q. When did you come to learn that?
A. July 2006.
Q. How did that come to your attention?
A. My contractor was installing a post and hit it with a backhoe as he was installing the post.
Q. And which contractor was that?
A. Phillip Stillman, Stillman Construction.
Q. Now, before your contractor had done that work to install the fence post, had he contacted Dig Safe?
A. Absolutely.
Q. And when did he contact Dig Safe?
A. Dig Safe -- this specific contractor contacted them, I believe, 72 hours prior to him digging.
Q. Did he get a Dig Safe number?
A. I believe that he did.
Q. Do you have any records? Have you seen any records of that Dig Safe number of that call?
A. No, I did not.
Q. Do you know if your contractor maintains copies of records such as Dig Safe numbers when he makes calls like that?

Q. Did Mr. Corina tell you what these service cards reflect?
A. It's an actual line that was installed, which is information that the department has on all water lines installed on this system.
Q. And you're reading from Exhibit Number 3 from Corina's deposition?
A. I am, I'm sorry.
Q. Did Mr. Corina tell you how long ago these water lines had been installed?
A. No.
Q. Did he tell who installed them?
A. He believes that a private contractor did that.
Q. Did you have any reason to believe that that's not accurate?
MS. NOONAN: Objection.
A. I don't know. I don't have any basis for that.
Q. Do you know what the Westerly Water Department's role is as far as installing water lines to private residences?
A. I do not.
Q. Do you know today who installed that water line across your property at 486 Atlantic Avenue?
A. I do not.
Q. Did you ever speak to the abutting homeowners

about that water line that runs across the
property?
A. I did not.
Q. Did you ever communicate to them in writing about
the water line that runs across your property?
A. I have not.
Q. Is there any reason why you haven't?
A. Counsel was.
Q. I don't want to hear about what your attorney
advised you. Do you know whose property line that
water line services, sir?
A. I do.
Q. Who does it service?
A. It services Mr. Dubreuil's property and
Mr. Henry's property.
Q. And do you know if either Mr. Dubreuil or
Mr. Henry had an easement across your property for
having a water line running to their home?
A. I'm quite confident that they do not.
Q. Have you yourself drafted up any easement language
for transmittal to them?
A. No, I have not.
Q. Did you ever speak to Mr. Corina any further about
this water line, after receiving his
correspondence of November 28, 2006?

Q. Do you know if before the plot plans were drawn, that have been previously marked as Exhibit Number H and Exhibit Number I, there was an underlying graph of the contours or conditions of the property done by your agents?
A. Based upon the similarity of the two, I would assume there was, and this would be that diagram, but I wasn't aware of it.
MR. CLOHERTY: Let's take a break for a minute.
(OFF THE RECORD)
Q. We'll move onto the next exhibit, sir.
A. Okay.
(DEFENDANTS' EXHIBIT M MARKED FOR IDENTIFICATION)
Q. Showing you, sir, what's been marked as Exhibit Number M for your deposition, can you tell me if you recognize what that is?
A. I certainly do.
Q. And what is it?
A. It's a document that I prepared for the tax assessor of the Town of Westerly.
Q. Do you know when you prepared that, sir?
A. There's a date, September 20, 2006.
Q. And was that in support of your request for an abatement of your taxes?

A. Yes, sir.
Q. And your property valuation is listed on there, sir; is that correct?
A. It is.
Q. And what was the valuation of your property at the time of that submission in September of '06?
A. $757,400.
Q. Is that land and building, sir?
A. I combined both, yes.
Q. Where did you obtain that value from, sir?
A. The land cards off of Vision.
Q. So that was the Westerly Assessing Department's valuation?
A. Yes.
Q. And you were objecting, when you sought abatement, to the valuation of your land or the valuation of your building or both?
A. Land.
Q. The valuation of your building was what, sir, that you were not objecting to?
A. $251,400.
Q. Do you know if that's still the assessed value of your land in Westerly -- property, building, excuse me, in Westerly?
A. I don't believe that it is. I believe that it

is higher.
Q. Do you know how frequently Westerly does revaluations of properties within the town?
A. I do not. The issue here was the house was not finished or complete, so they didn't have the assessed value totally in there. It was based upon a point in time of July 1st.
Q. And the valuation of the land that you were objecting to was how much, sir?
A. At that point it was $506,000.
Q. And the reason you were objecting is because why, sir? Why did you think that that was overvalued?
A. There are several blemishes on the property that were not disclosed.
Q. And what were you referring to?
A. The drainage swale and the water main, and the lack of use of the property or the freshwater wetlands that were created on the property.
Q. The comparisons that you referred to there, sir, where did you get the valuations for those comparable properties?
A. Vision, which was the Town of Westerly's land cards.
(DEFENDANTS' EXHIBIT N MARKED FOR IDENTIFICATION)
Q. Showing you, sir, what's been marked as Exhibit

MS. NOONAN: Objection.
A. No, I don't have any idea.
Q. In Exhibit Number N, that's the letter from Miss Mangan, anywhere in there does she mention that these were freshwater wetlands?
A. No, but she indicates that all of the wetlands are in the area subject to storm flow, in the triangle, in the back or the northwest corner of the property.
Q. Does that, in your mind, render them freshwater as opposed to saltwater?
A. I would assume that the water that created it would have been the freshwater if they sit within that area. They're the same species.
Q. Would you agree with me that everywhere along Atlantic Avenue is subject to storm water overflow, isn't it, sir?
MS. NOONAN: Objection.
A. No.
Q. You don't think there is any storm water overflow that affects other areas of Atlantic Avenue besides your property?
A. Other areas, yes, not the whole.
Q. Did Kathleen Mangan ever put in writing to you at all that she considered this freshwater isolated

coastal wetlands as opposed to saltwater?

A. No.

Q. So the only place it would be recorded would be something from Scott Rabideau that you don't have a copy of?

A. That's correct.

Q. Isn't it possible, sir, that those wetlands on your property are simply saltwater wetlands that have been in existence as long as all the other wetlands in the immediate vicinity of your property?

MS. NOONAN: Objection.

A. It would be ironic that they would sit in the same path as the area subject to storm flow and would be specifically in the same path.

Q. Have you ever known this area of Atlantic Avenue to suffer flooding from saltwater by high tides or storm action?

MS. NOONAN: Objection.

A. Not that I'm aware of. Not in my lifetime.

Q. Not since you've been at the property?

A. That's correct.

Q. Why is your house on pilings, sir?

A. Flood level.

Q. And what would flood to put it on pilings?

A. Storm flow, storm surge from the pond, storm flow from the ocean.
Q. Are you familiar with the 10-year or 25-year or 100-year storm effect in the area of Atlantic Avenue, sir?
A. Yes.
Q. What's your understanding of the expected height of the water level for each of those storm events?
MS. NOONAN: Objection.
A. There is an elevation that's set by a governing body, and based upon that, they determine what the flood level would be at that 100-year storm, and that's what they built the house on.
Q. So how high is your house, sir?
A. Fourteen feet off the ground.
Q. And is that a height sufficient to withstand a 100-year storm event?
A. Currently, yes.
Q. Do you know what the 100-year storm event measurement is?
A. I do not.
Q. Somewhere below 14 feet?
A. I do not know.
Q. Do you know what the 25-year or 10-year storm event heights are for that area?

didn't do it, and the fact that it wasn't logical for you to have done it?

MS. NOONAN: Objection.

A. I would agree with that.

Q. Now, did she physically come to the property and look at it?

A. Yes, she did.

Q. Were you present?

A. No, I was not.

Q. What other communication did you have with her before this letter was generated?

A. That was the only communication I've ever had with Lauren Miguel before this was generated -- well, I called her on the phone the first time. I said, "Miss Miguel, please take a look at the property. Also, can you take a look and see if I can alter it back to its original state." I called to follow up with her, because it was the holiday, because it took her a couple weeks, because my initial call was in early June, and then I called her again probably a week or two before this letter was issued, and then she mailed this letter out.

Q. And as a result of this letter, did you receive a fine or a penalty?

A. No, I did not.

Q. Were you under any specific order from CRMC to cease and desist or stop any further action?

A. No, sir, I was not.

Q. Did CRMC order you to undertake any remedial steps to repair the excavation work that had been done?

A. No, they did not.

Q. What is your understanding of the outcome of CRMC having reviewed the property?

A. Number one, that I wasn't accountable for the alteration. Number two, it allows me to put the storm -- or the area subject to storm flow back to its original construction, and to place some conservative seed, to make sure that all the exposed soils that were touched can grow back to a natural habitat.

Q. Did you, in fact, undertake to do that, sir?

A. We did.

Q. And how did you do so?

A. Mr. Russo.

Q. And is that the letter that was previously marked as Exhibit Number B?

A. No.

Q. Why don't we look at Exhibit Number B, if we can. Showing you Number B, it does appear to be dated

easterly isolated coastal wetlands where it's labeled buffered zone?

A. That's correct.

Q. And what did CRMC require you to do as a result of that conduct, sir?

A. We are going to be removing the existing -- there is an electrical panel box that's outside of the buffer zone. We will be reducing the size of the driveway, and we will be removing some light posts that were placed on the property, and, finally, we will do some plantings to restore the coastal wetlands back to its original intent.

MR. CLOHERTY: Can I have this marked.

(DEFENDANTS' EXHIBIT Q MARKED FOR IDENTIFICATION)

Q. Showing you what has been marked as Exhibit Number Q. It's a three-page document. It's a series of letters, I believe. So take a look at them, and tell me if you recognize them?

(WITNESS PERUSING DOCUMENT)

A. I do.

Q. And what do you recognize those to be?

A. Cease and Desist Order from Coastal Resources Management Council dated September 15, 2006; Notice of Administrative Fine, Coastal Resources

Management Council letterhead, dated September 15, 2006, and a copy of the previous Exhibit O with a notation in my handwriting.

Q. Now, I don't know if that last one was attached to the first two letters. Did that last page come from CRMC as well?

A. No. Do you want me to remove it?

MR. CLOHERTY: Why don't we do some housekeeping here. We will go off the record for a minute.

(OFF THE RECORD)

Q. So earlier you had mentioned that you had been cited by CRMC for violations. Were these the violations you were describing, sir?

A. Yes, they are.

Q. Other than these violations, have you ever been cited by CRMC on any other occasions?

A. No, sir.

Q. Did you have to pay a monetary fine to resolve this issue as well, sir?

A. No, I did not.

Q. On Page 2 of Exhibit Q, it indicates there was an administrative fine of $1,500. Do you see that, sir?

A. I do.

Q. What ever happened with that administrative fine?
A. I was never assessed an administrative fine.
Q. Who is that directed to?
A. To David Ciampi.
Q. Is that not an assessment of a fine, sir?
A. I never physically paid an administrative fine.
Q. Was there an appeal process from that where you successfully appealed not having to pay that fine?
A. I'm not quite sure on that.
Q. As far as an enforcement action goes, though, you're required to do those things that you just enumerated, as far as reducing the size of the driveway and removing some fixtures?
A. Yes.
Q. How is it that CRMC came to issue this Cease and Desist Order?
MS. NOONAN: Objection.
A. I'm not quite sure.
Q. Did you alert them that you had been doing work in those areas, which they said you couldn't work in?
MS. NOONAN: Objection.
A. No, sir.
Q. Do you know if somebody else alerted them?
A. I'm not quite sure.
Q. Did CRMC ever tell you how they came to find out

CRMC and the local building official, as far as enforcing CRMC guidelines for construction in their jurisdiction?

MS. NOONAN: Objection.

A. I don't have any knowledge.

MR. CLOHERTY: Why don't I have this marked as an exhibit.

(DEFENDANTS' EXHIBIT S MARKED FOR IDENTIFICATION)

Q. Showing you, sir, what has been marked as Exhibit Number S for your deposition. Can you tell me what that document is?

A. This is an application or an as-built that we had to create for Coastal Resources Management Council.

Q. And, actually, I reduced the fuller size plan for purposes of this deposition, so I'm going to show that to you here today as well, and I think the date got cut off on the as-built plan. The large size one that I'm showing you now has a date of January 29, 2007. Do you see that, sir?

A. I do.

Q. And just so the record is clear, it's Bates No. 300 that was produced by your counsel in this case. Is that consistent with your memory as to when this as-built plan was drafted in January of

'07?

A. I am.

Q. And the purpose of this as-built plan was what, sir?

A. To go back to Coastal Resources Council to determine what will remain and what work will need to be revised based upon the Cease and Desist Order of September of '06.

Q. And in here, in fact, it depicts the location of the existing electric panel that you mentioned?

A. Yes.

Q. And the lamp post that you mentioned?

A. Correct.

Q. And wood posts as well at the lower right-hand corner of your property?

A. Yes.

Q. And those areas were not to be built on, is that why they're in violation of CRMC?

A. That's correct.

Q. Now, I note they're also outside the arc of your property. Is that one of the reasons they were concerned, or was that not a concern of CRMC?

MS. NOONAN: Objection.

A. Not a concern of CRMC.

Q. Why were those installed outside of the arc of

your property, sir?
A. Again, that was the contractor who installed them.
Q. The shaded area here showing an existing driveway also is labeled, at the top of that shaded area, "existing pea stone." Do you see that, sir?
A. That's correct.
Q. Does that mean that there's all stone and gravel in that area that's shaded?
A. Yes, sir, there is.
Q. Doesn't that area basically encompass all that isolated coastal wetlands on the right-hand side of the property?
A. A piece of it, yes -- actually, the whole thing.
Q. So that as-built plan as of January 29th of '07 got rid of the isolated coastal wetlands on the right-hand side of the property?
A. That is correct.
Q. And it's now gravel paving?
A. Not paving. Gravel, pea stone.
Q. And according to this as-built, there is an outside shower that, apparently, also incurs on or occupies some of that isolated coastal wetlands area as well?

A. That is correct.
Q. Did you know that all this was going to built on that isolated coastal wetlands when it was done?
MS. NOONAN: Objection.
A. I didn't realize the impact or the proximity to it. Nobody had ever come in and flagged it specifically that that was going to be the isolated wetlands area.
Q. I thought we talked about earlier, in Exhibit Number H, that there were flags put by your biologist as to that easterly isolated wetlands?
A. Over time with the rain and storms, those flags are probably -- again, this was done in 2001 or 2000, the flags. This is 2007.
Q. So by six years later or so, those flags were gone and the construction went on ignorant of the existence of those wetlands?
A. That's correct.
Q. Now, there's also a note on the left-hand side, "Dashed line represents proposed building per ISDS plan referenced in Note #1." Do you see that, sir? I'm pointing to this middle note.
A. Okay.
Q. And, in fact, comparing this footprint that's indicated in this as-built with the footprint of

the building in Exhibit H, it appears to be a
larger footprint. Do you see that, sir?
A. I do.
Q. Was that increase in size something that was
approved by CRMC?
MS. NOONAN: Objection.
A. Per the architect and per the building official
of the Town of Westerly, it fell within the zone
because there was no pilings that are in those
areas, and, in fact, it was a Sonotube that's
holding up that area, and if you look at the
original plans of the house, which were approved
by both Coastal Resources Management Council and
the Town of Westerly, it falls within that zone.
Those are supposed to be decks. What we did was
we enclosed the decks and put windows in, and that
was approved by Mr. Fraser and the architect.
Q. Apparently it wasn't approved by CRMC, though?
A. Correct.
Q. And CRMC is citing you for that overbuilding as
well?
A. I don't believe that that's going to be part of
the issue for remediation.
Q. Now, there's proposed permanent markings on the
northerly limit of construction on Exhibit Number

H for your property. Do you know if those permanent markings were ever put in physically on the property?

A. We put them in. We were off, based upon the work that was done by the land surveyor, so we have to go back now and put those in permanently where they should go.

Q. On your as-built, it appears that the footprint of your property basically extends right up to those proposed permanent markers; is that correct, sir?

A. That appears to be accurate.

Q. And the wooden deck that was constructed on the side of your property would extend beyond the buffer zone for the wetlands on the eastern side of the property, correct?

MS. NOONAN: Objection.

A. That is correct.

Q. Are they making you take the deck out and the outdoor shower out?

A. The outdoor shower will be removed. The deck will stay in existence.

Q. And are you going to have to get rid of that existing pea stone and put down vegetation?

A. Yes, sir.

Q. Is your existing building two bedrooms still, sir?

into the lot, so I think we had to shrink the size of the actual physical dwelling. So the width of the house had to be shrunk, I believe, and they were concerned with some of the coastal features.
Q. What do you mean by coastal features?
A. The wetlands in the back of the property.
Q. Do you know if you were seeking a variance from their guidelines, that you wouldn't have to comply with their guidelines to a certain extent?
MS. NOONAN: Objection.
A. I believe that we did, because of the fact that you're within 100 feet of the salt pond, so you had to apply for a separate variance for building on that property.
Q. So to build at all within 100 feet of the salt pond, you had to get approval?
A. Don't quote me on that, but I believe there was something of that nature in the dialogue.
Q. Are you within 100 feet of a salt pond?
A. I believe that I am or right around there.
Q. I didn't realize it was that close to the property, and that's from the back portion?
A. The back portion, yes.
Q. Now, directing your attention to Interrogatory Number 18, sir. That's a question regarding the

A. It is.
Q. And before signing this, did you review the answers for accuracy and completeness?
A. I believe that I did.
Q. And were they accurate and complete, to the best of your knowledge?
A. I believe so.
Q. Is your home on the property at 486 Atlantic Avenue completed, sir?
A. It is.
Q. And you've got an occupancy permit?
A. I do.
Q. Have you been living there physically, sir?
A. We go down on weekends. We go down during the summer.
Q. And when was the occupancy permit granted, sir?
A. Late July, early August of 2006.
Q. Since that time, can you estimate how much time you've spent living at your home at 486 Atlantic Avenue?
A. Maybe 10 or 12 weekends, maybe 15.
Q. Have you spent any vacations there, as far as a straight week or two weeks there at the property?
A. No.
Q. And have you rented out the property when you're

or seven hundred dollars for a long weekend.
Q. Are you happy with the construction of your home, sir?
MS. NOONAN: Objection.
A. No.
Q. Do you have any ongoing actions with your contractor that built the home to remedy or complete it?
A. Let me clarify. I'm not upset with the construction or the quality of it, just the way that it came out. And that, unfortunately, was due to the parameters of what I was able to work with. I envisioned something different.
Q. And just to clarify that last statement, you envisioned something different from when you first bought the property or from when construction commenced?
A. When I first bought the property.
Q. From when construction commenced, and you decided to go forward with your construction plans, are you happy with how the building came out, sir?
MS. NOONAN: Objection.
A. The quality of it came out perfect.
Q. It's a nice home, isn't it, sir?
MS. NOONAN: Objection.

about moving that water main?
A. No, I have not.
Q. Do you desire the Town of Westerly to go on to your property and dig up that water main and move it to another location?
A. Something needs to be resolved with the water main.
Q. Are you aware that the Town of Westerly's position is that it's not the town water line; it's a private water line?
A. I am now.
Q. Did that water line affect your ability to build on your property at all?
A. We weren't aware of it.
Q. So you were able to put the pilings in on your building without incident?
A. Yes.
Q. And you were able to construct above those pilings, correct?
A. Yes.
Q. Did the location of that water line affect your construction in any way whatsoever, other than that fence post that was dug?
A. No.
Q. What damages are you contending you suffered as a