# EXHIBIT "B"

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

DAVID M. CIAMPI

vs. C.A. No. 07-256S

ETSUKO MOTOKI ZUCZEK, in her capacity as Finance Director of the Town of Westerly; PAUL CORINA, in his capacity as Superintendent of Water of the Town of Westerly, and PETER CHIARADIO, in his capacity as Superintendent of Public Works of the Town of Westerly

DEPOSITION OF JEFFREY D. HENRY, a Witness in the above-entitled case, taken on behalf of the Defendants, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Pierce, Davis & Perritano, LLP, 128 Dorrance Street, Providence, Rhode Island, on March 25, 2008 at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFF......ADLER, POLLOCK & SHEEEHAN, PC
BY: ELIZABETH NOONAN, ESQ.
ONE CITIZENS PLAZA
PROVIDENCE, RI 02903

FOR THE DEFENDANTS.....PIERCE, DAVIS & PERRITANO, LLP
BY: JOHN J. CLOHERTY, III, ESQ.
TEN WINTHROP SQUARE
BOSTON, MA 02110

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

(DEPOSITION COMMENCED AT 10:05 A.M.)

JEFFREY D. HENRY

Being duly sworn, deposes and testifies as follows:

THE REPORTER: Would you state your full name for the record, please.

THE WITNESS: Jeffrey David Henry.

EXAMINATION BY MR. CLOHERTY

Q. Now, Mr. Henry, can you please state where you presently reside, sir?

A. My tax bill says 15 Shore Gardens Road, Number 3, and the mailing address for that same piece of property is 484 and a half Atlantic Avenue, Westerly, Rhode Island.

Q. I'm going to go over some background information for us, sir. Have you ever been in a deposition like this before?

A. I have not given a deposition like this before, but I've been party to a deposition.

Q. Okay. Well, let me -- the reason I'm asking is I just want to go over some of the ground rules of how depositions should proceed. I'm going to ask you to answer all your questions verbally rather with a simple nod of the head or uh-huh.

A. Yes, sir.

address for?
A. I always mess this up, but I think it was March of 1991 is when I finally moved in.
Q. Now, just to clarify, your naval service, you were in the Navy up until 2005?
A. Yes, sir.
Q. Where were you assigned at the time of 1991?
A. When I first moved into the property in '91, I was working in Groton, Connecticut at the naval submarine base.
Q. So have you lived continuously at the Westerly address since 1991?
A. With the exception of -- I have maintained that as my primary residence. I've maintained my citizenship in Rhode Island with the exception of my military obligations, which I served quite long stints in Kings Bay, Georgia as my primary residence.
Q. And not to get into too much detail, when you were activated or mobilized somewhere, did your family stay at the Westerly address?
A. At the time I was single, so...
Q. And maybe I need to clarify that, when did you get married, sir?
A. 2002. January 19, 2002.

Q. And since '95, was your primary residence for military purposes -- you kept Westerly as your primary residence since '95, did you live in Westerly continuously until the present?
A. No, sir.
Q. Can you clarify that?
A. There was a new construction period about 16 months or so in Groton, and then the command shifted again, it was a new submarine, this submarine also shifted to its home port in Kings Bay, Georgia, and I did the transit every six months or so for a couple of weeks until 1999. December of '99 I transferred back to Groton, Connecticut Naval Submarine School, and I've lived in the house since then.
Q. Thank you. Now, are you the primary owner of the house, sir?
A. Yes, sir.
Q. Is there anyone else that owns the house with you?
A. No, sir.
Q. Has that house been in your family before you came to be the owner?
A. Yes, sir.
Q. How long has the house been in your family?
A. My dad purchased it, I believe in 1970.

probate, I didn't have any access to the house for the few years it was in probate, and then I moved in. My understanding is that -- I hadn't been there, so it's all hearsay on my part, but my cousins lived there while I didn't live there. When I moved in, I've been in it since.
Q. Okay. Knowing that area of Westerly as somewhat of a seasonal housing area, was this a house your family used just in the summertime or year-round?
A. My mom and dad were divorced, that was his primary year-round residence, and I lived in North Providence for most of my life -- all my childhood life.
Q. So, you grew up in North Providence?
A. Yes, sir.
Q. How frequently as a child did you go down to that Westerly address?
A. Off and on. For quite awhile it was most weekends and then most of the summers.
Q. So as a child up until --
A. When I was about the age of 10, I was deemed old enough to be put on the bus at one end, my dad picked me up on the other end, so I would take the bus or the train, whichever was best for the weekends, and then in the summer I tried to spend

as much time as I could there.
Q. Now, so you feel that you're familiar with the area since 1970 or so, since the time your dad purchased it?
MS. NOONAN: Objection. You can answer. I may make objections.
A. As far back as I can remember. I remember going down there on the weekends and hanging out with my dad, working with him. He used to do -- after he retired from the Navy, I think he retired in '71, he used to do odd jobs down along the beach.
Q. Now, are you familiar with that area of Westerly based on this time that you've been there?
A. Fairly familiar, yes.
Q. Can you describe the area of Atlantic Avenue and Shore Gardens Road in terms of build-up or geography?
A. It's built up significantly housewise, and I remember when I was a kid it was like a ghost town down there. You could count the number of houses that you could see that had year-round residents in them. Now it's significantly different. There's actually traffic in the winter which is -- when I say traffic, there is a steady flow of cars

that go by on a daily basis. So it's changed significantly.

Q. How about the geography of the area, how close is your home to the beach?

A. I live on the opposite side of Atlantic Avenue from the beach, so I live on what everybody refers to as the pond side, Winnapaug Pond is behind me. I live behind someone else. I have an easement through 484 Atlantic Avenue into my lot because if you look at the plat map, my road was never installed. My road is supposed to be at the opposite end of my lot where I actually have access today. So that road was never built and so I have an easement through the front property, 44.

Q. I'll mark that plat plan in a moment as an exhibit and we can go over it. I'm more interested right now, can you estimate the distance from the ocean that your house is?

A. 5 to 600 feet, maybe a little more than that.

Q. And my understanding is that this area of Atlantic is bordered on the south by the Atlantic Ocean, and on the north is a salt pond?

A. Yes, sir.

Q. What's the name of that salt pond?

A. I believe it's Winnapaug Pond.

Q. How far is your home from that pond?
A. At a real high tide, it's right next to it.
Q. What do you mean by that?
A. I have -- 50 feet of my property is wetlands so some of the seasonal weather we've had in the last few weeks, the right tide and wind direction and tide time, wind direction and strength of the storm, the property abuts the water. So the high tide will hit up against -- actually, it comes 50 feet into my property.
Mr. Dubreuil, you spoke to yesterday. Sometimes I look at his house and it looks like a houseboat, he's completely surrounded by water.
Q. Describe your house a little bit further, does your house have a slab basement?
A. Yes, sir.
Q. Okay. Is it on any kind of elevation?
A. No, sir.
Q. Some of the houses in the area have stilts; is that correct?
A. Yes, sir.
Q. Your house doesn't have stilts?
A. No, some fill was put into two-thirds of my lot years and years ago, not exactly sure when, by my dad, and so we sit about 18 inches above

Coastal?
A. Coastal Resource Management, I guess between them and DEM and then the town all have to do the permitting.
Q. I'm going to refer to the Coastal Resource Management Council as CRMC; are you familiar with that?
A. Yes, sir.
Q. That retaining wall, how large a retaining wall is that?
A. To the top of the retaining wall it's a series of six by six timbers. I would guess it's about two and a half feet high. It's tough to say, because there is a lot of growth.
Q. A lot of vegetation?
A. A lot of vegetation.
Q. Did you install that retaining wall?
A. No, sir.
Q. Do you know how long that's been in existence for?
A. I don't know exactly, but I believe my dad did it.
Q. And you mentioned earlier certain high tides the pond comes up to your property line, does it come up to the retaining wall?
A. It comes into my property up to the retaining

wall.
Q. Have you had the tide overflow the retaining wall?
A. Once.
Q. And when was that circumstance?
A. It was right after I moved in, of course, probably in '92, '91 or '92, I got a little bit of water in my basement which has never happened, other than that one time, to the best of my knowledge.
Q. You say basement, is there an actual basement?
A. Well, the first floor, I meant.
Q. You have an apartment on that first floor?
A. Yes, sir.
Q. Other than that, you haven't had any intrusion of water since you've own the property?
A. Not that I'm aware of, no.
Q. Now, are you aware of the existence of any wetland areas to the south of your property on the ocean side?
MS. NOONAN: Objection.
A. Again, wetlands, I guess is subjective. There's some low-lying areas that always appear wet.
Q. Where would that be?
A. Let's see, I know -- that's not really south

Q. You described some of these areas of wet property or wetlands, had those conditions existed since you've been owner of the property?

MS. NOONAN: Objection.

A. Yes.

Q. And in your childhood, going to that property in the summers and weekends, were the same wetland type conditions in existence?

A. Yes, sir.

Q. Now, have you ever had occasion to observe any flooding along the roadway of Atlantic Avenue?

A. Yes, sir.

Q. Can you describe the frequency of observing flooding along that roadway?

MS. NOONAN: Objection.

A. Whenever it rains, it gets quite wet. We have a standing puddle directly in front of my driveway which passes through Lot 64, it will rain -- it takes just a minimal amount of rain to get a small puddle there. When it rains a lot, it gets significantly large, several hundred feet across, up and down Atlantic Avenue.

Q. And after a significant rain event, is there standing water along Atlantic Avenue?

A. Yes, sir.

Q. And do you know the depth of that water, or how big a puddle it gets?
A. It can be up to, I would say -- I don't go measuring it every time. I would say anywhere from four inches to eight inches deep, maybe 10 inches deep at times.
Q. And how long since you've been on the property have you observed puddling or flooding on Atlantic Avenue of that magnitude?
MS. NOONAN: Objection.
A. For as long as I've been going there, we were proud of the size of our puddle. It's so big. They've put several little layers of blacktop to reduce it a little bit, but at one time it was of fairly significant depth and length.
Q. Even in your childhood you say that puddle would occur?
MS. NOONAN: Objection.
A. Absolutely.
Q. And the puddle that size, how long would it take to dissipate or remove -- be removed?
A. It takes several days. On the rains we've just had recently, there was probably four or five inches of water there, maybe six at the height of the storm, and then it was there for at least two

days after that.

Q. Now, you mentioned there is a point in time there was some buildup of the roadway, additional layers. Do you remember when that occurred?

A. No, sir.

Q. Do you know who did that work?

A. I would imagine it's either the town or the State who applies blacktop to the roads, and I don't know who. The reason being, we used to have like the world's large pothole right there also. I think that's why there was layers of blacktop applied. It was to fix -- they would put cold patch in it, and the cold patch would come out and then -- literally that pothole was as big as a car at one point. I remember that years ago, and they've had to fix the road there to prevent the pothole.

Q. So they repaved the road in that area?

A. Yes.

Q. Do you know how big of an area was repaved at that time?

MS. NOONAN: Objection.

A. I don't off the top of my head, but it covers -- it starts somewhere -- I think it starts somewhere before Shore Gardens Road and it goes

A. No, sir.

Q. Are there homes on those other properties on Shore Gardens Road, 146, 147 and 144?

A. There is no house on 146, no house on 147 and no house on 143. So 144 does have a building, 145 does have a building.

Q. Are there any other homes beyond those plots on Shore Gardens Road towards the salt pond area?

A. No sir.

Q. Is Lot 68, which is behind you, is that occupied?

A. No, sir.

Q. Are any of those lots along that paper route occupied?

A. Once you get over to the road to the west of Shore Gardens Road out by Lot 73, there are some houses out there, but I don't know what lot they sit on. They use access through that westerly road.

Q. Do you know what the name of that road is?

A. No, sir.

Q. Does it have a name?

A. Not that I'm aware of.

Q. Now, are you aware of any type of drainage ditch that runs in the vicinity of Atlantic Avenue and Ciampi or McGrath property?

MS. NOONAN: Objection.

A. Yes, sir.

Q. And what is your knowledge of that?

A. My knowledge of that is it starts off just to the right -- east side of my easement, it goes in 20, maybe 30 feet, maybe a little bit more, and it starts on the McGrath property, and then it kind of straddles the line for a little bit and it ends on the Ciampi side.

MR. CLOHERTY: Why don't we do this, why don't I mark the next exhibit, sir, for you.

(DEFENDANTS' EXHIBIT 2
MARKED FOR IDENTIFICATION)

Q. Showing you what's been marked as Exhibit Number 2, have you ever seen this document before?

A. It looks similar to the document I received for the ISDS application process for Mr. Ciampi.

Q. I'll suggest to you this is a plot plan for proposed construction on Lot Number 65 along Atlantic Avenue and there appears on the left-hand portion of this document an existing gravel driveway; do you see that designation, sir?

A. Yes, sir.

Q. Is that consistent with your easement to your property?

of follows the natural contour of the fill that's in my driveway off to the east, and it becomes shallower, shallower and shallower, and at one point it's just like a little depression, then it kind of disappears into the vegetation shortly after it gets on to Mr. Ciampi's property. So it's not the easiest thing to see. In the winter you can see it a little better, very difficult to see in the summer because of all the growth.

Q. Can you estimate at least at the visible portion on the McGrath property the size of the ditch in terms of its depth or width or anything to that extent?

A. At the most, it's one to two feet wide, and I'm guessing, from the top of my driveway to the bottom of the ditch, might be a foot and a half.

Q. Do you know how long that ditch has been in existence for?

A. To the best of my knowledge, as long as I can remember there always has been something there, a depression, a ditch.

Q. You came to the property on a regular basis in your childhood during the 1970s?

A. Yes, sir.

Q. Do you have any memory of the existence of that

ditch at that time?

MS. NOONAN: Objection.

A. In 1970, probably not, but I remember as a young child jumping over the ditch with water in it, in the summer and in the winter. I remember jumping across it when it was full of ice or had a thin sheet of ice and all the water underneath had dropped down or frozen. I remember crunching the ice when I was younger, probably a young teenager.

Q. What years would that have been?

A. That I'm not sure of. I guess I was probably 12 or 13.

Q. When were you born, again, sir?

A. 1962.

Q. So it would be -- in '74 you would be 12 years old, around that time, mid-'70s?

A. Yeah, mid-to-late '70s, I'd say.

Q. Now, has the size or distance of the drainage ditch changed in any significant aspect since the time that you played there as a child?

MS. NOONAN: Objection.

A. I don't remember the ditch being any wider, any narrower. I know that there was, along the western side of the ditch, there may still be there, there was like some railroad ties and my

Atlantic Avenue?
A. Yes. I've seen Atlantic Avenue completely submerged from the one mile portion from my house all the way up to the bridge at the inlet.
Q. And how often have you seen that happen?
A. Usually happens once a year. Again, it takes the right storm conditions, tide conditions. I've driven on the sidewalk several times to get home.
Q. Do you have a four-wheel drive vehicle?
A. Yes, sir, I do now.
Q. You say after rain events you notice there is some standing water in that ditch?
A. Yes, sir.
Q. Can you describe or estimate how long the standing water stays in the ditch for?
MS. NOONAN: Objection.
A. Again, it takes several days -- on the storms we've just had, I didn't look when I went out of the driveway this morning, it may be dry today, but it's normally in there the next day as well as on the street, so...
Q. Have you ever yourself contacted anyone from the State or the town to ask them to come out and clear the ditch?
A. No, sir.

crane. I got a little nervous because my waterline passes through his property, and I actually went to the town to figure out how far in my waterline was to make sure they didn't drive a post right through it.
Q. And how is it that you knew your waterline passed through his property?
A. Just general knowledge. Myself and Mr. Dubreuil have a T in Mr. Dubreuil's yard, and it was just general knowledge that it came through that lot, T'd off in Mr. Dubreuil's lot into my house, common knowledge.
Q. Were you aware of the existence of any easement or right of access to have this waterline going across his, Mr. Ciampi's property?
A. Not that I'm aware of.
Q. Okay. Did you undertake any efforts to maintain that water pipe as it ran across Mr. Ciampi's property?
A. No, sir.
Q. Do you know if anyone since you've been going to the property ever dug up that water pipe and checked on it or anything to that extent?
A. Not that I'm aware of, only with the exception of -- my understanding is Mr. Ciampi was

A. That's what my dad told me, that's the story. He said they were Poguonock Bridge houses in Connecticut.

Q. My question is, do you know when that house was moved to Westerly and first put in its present location?

A. No, sir.

Q. Showing you, sir, what's been marked as Exhibit Number 3 for your deposition, I ask you to take a moment to look at that, tell me if you recognize it?

A. I do.

(DEFENDANTS' EXHIBIT 3
MARKED FOR IDENTIFICATION)

Q. What do you recognize it to be?

A. It looks like the document that I got from the town to verify that they didn't hit my waterline or bend it, stress it, almost hit it or hit it.

Q. And this appears to be a line diagram showing existence of where water service would run and, in fact, it's titled at the top, water service 84 and a half Atlantic Avenue; do you see that?

A. It's actually 484 and a half.

MR. CLOHERTY: I'm sorry.

A. Yes, sir.
Q. Is that your mailing address, 484 and a half?
A. Yes, sir.
Q. And at the top there appears to be a structure labeled Michael Garafolo; do you see that, top left-hand corner?
A. Yes. I guess -- he was the original owner that my dad purchased the property from.
Q. Now, when you did your measurements, how did you know where to measure from?
A. I just took this one, and then there was another page, I think it measured from maybe this has it on there, too, on the right it says pole 624. There is a telephone pole there and I assume that's what that was, and then I measured from the corner of their deck and, actually, I think I might have strung a string as close as I could along the property line, and then just measured in approximately 48, 49 feet. I think that's what I did.
If you look at Exhibit, let's see, 2, the northwest corner of Mr. Ciampi's yard is where my property and Mr. Dubreuil's property and Mr. McGrath's property come together, and when I had my addition done, 150 feet to the north of

that was a stake that was surveyed so that I could get my permitting for my addition replacement.

I think I tied a string on the stake, ran it through the pipe in the ground that was on that four corners of all the property and just kind of winged it out to the road because there was no marker on the road I could find, and then I measured over from that.

Q. Now, since this construction took place, have you engaged in any discussions with Mr. Ciampi to obtain an easement for this waterline that runs in this property?

A. No.

Q. Is there any reason why not?

THE WITNESS: Why I would ask for an easement?

MR. CLOHERTY: Yes.

A. I don't know of any -- no one ever asked me to get one.

Q. Mr. Ciampi hasn't asked you for an easement?

A. No, sir.

Q. Did you talk to him about your concerns that his construction might damage the water service to your property?

A. Let me just say this right now. The extent

A. Yes, sir.

Q. Is that your father's name?

A. That's my father's name, yes, sir.

Q. But you're both Jeff Henry?

A. Yes.

Q. Now, the second sentence in this first paragraph states, "It is Mr. Ciampi's understanding that you have entered his property and excavated and partially filled a drainage ditch causing water to flood on to Mr. Ciampi's property, all of which work was not authorized by my client." Do you see that, sir?

A. Yes, sir.

Q. Is that an accurate statement?

MS. NOONAN: Objection.

A. No, it's not an accurate statement.

Q. Do you know where Mr. Ciampi -- what he based that understanding on?

MS. NOONAN: Objection.

A. I don't.

Q. Did you ever enter his property to excavate or partially fill the ditch?

A. No, sir.

Q. Do you know if he ever suffered water flooding onto his property from the drainage ditch?

those?
A. No, ma'am.
Q. Then you indicated back in the 1970s when you would go there as a child, you described it as a depression or a ditch. Can you describe if there was a difference in how the ditch or depression looked during the period of time?
MR. CLOHERTY: Objection.
A. The most vivid recollection I have of it was in the winter. I was the only kid for miles down there, and I would go out walking around, hiking basically through the three, four, five lots down there, and I remember jumping across the ditch that had a skim layer of ice on it, it was like a big void under it, I guess the water had eventually soaked into the ground or whatever. Then I spent the next half hour breaking the ice, other than walking around picking up bottles and cans and things like that.
Q. Did you get recycling money for those?
A. They didn't have it then.
Q. In terms of your waterline, you are aware that it is on Mr. Ciampi's property, correct?
A. Yes, ma'am.
Q. Have you ever had any issues with your water

A. I can't tell it's a camera. I see something on the side of the house where they pointed to it. They said it was a camera.

Q. So aside from the framers, who were the framers, do you recall the names?

A. Chris and Mike, it could be Algere, I think is their names.

Q. Aside from Chris and Mike Algere, the framers, and Mr. Peloquin, have you spoken with anyone else who had -- you've seen on the property, anyone from DEM?

A. There was a lady walking through McGrath's property, and I said, can I help you, she just said I'm from DEM. Didn't talk to her. It was from either my deck or steps. Didn't get her name, just took it for whatever she said, went about my business.

Q. In the last two, three years?

A. Yes, ma'am.

Q. Anyone else you can think of?

A. No, ma'am.

Q. You said -- one clarification on this, you mentioned at one point about Atlantic Avenue flooding and seawater would come up to people's tires, you mentioned something about seawater?

A. What happens is when you get the right weather and tide conditions, I have to say 99 percent of Atlantic Avenue will be covered with water, either from a fraction of an inch to several feet, depending on -- the south side will be fractions of an inches on the sidewalk, to feet on the north side, the pond comes right in.

Q. Aside from pond flooding, Atlantic Avenue floods out just with rain incidents?

A. Absolutely.

Q. Even if the pond stays where it's supposed to, you will still get flooding on Atlantic Avenue?

A. For large portions, yes.

MS. NOONAN: I don't have anything else.

MR. CLOHERTY: Nothing further, sir. Thank you for your time.

(OFF THE RECORD)

MR. CLOHERTY: Back on the record. I've spoke to the witness about his right to review the transcript once it's completed, and he's said he doesn't -- you don't have a need to do that; is that correct?

THE WITNESS: No, sir.

(DEPOSITION CLOSED AT 12:59 P.M.)