# EXHIBIT "I"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DAVID M. CIAMPI,

vs. C.A. No. 07-256 S

ETSUKO MOTOKI ZUCZEK, in her capacity as Finance Director of the Town of Westerly; PAUL CORINA, in his capacity as Superintendent of Water of the Town of Westerly, and PETER CHIARADIO, in his capacity as Superintendent of Public Works of the Town of Westerly,

DEPOSITION OF FRANCIS DUBREUIL, a witness in the above-entitled cause, taken on behalf of the Defendants, before Devin J. Baccari, CSR, a Notary Public in and for the State of Rhode Island, at the Westerly Town Hall, 45 Broad Street, Westerly, Rhode Island, on March 24, 2008 scheduled at 10:00 a.m.

PRESENT:

FOR THE PLAINTIFF

ADLER, POLLOCK & SHEEHAN, P.C.
BY: ELIZABETH MCDONOUGH NOONAN, ESQUIRE

FOR THE DEFENDANTS

PIERCE, DAVIS & PERRITANO, LLP
BY: JOHN J. CLOHERTY, III, ESQUIRE

ALSO PRESENT: CHERYL GRAYKO

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

here today, sir, are you?
A. No. No.
Q. And you're accompanied by, I believe, your daughter?
A. My daughter, Cheryl.
Q. Okay. Did you do anything to prepare for your deposition here today, sir?
A. Nothing.
Q. Okay. Can you just tell me some background information. Where do you currently live, sir?
A. 4 Shore Garden Road, Westerly, Rhode Island.
Q. And what is your date of birth, sir?
A. 7/5/29.
Q. And are you married or single?
A. Widowed.
Q. Okay. And how many children do you have, sir?
A. Two.
Q. Any grandchildren?
A. Two.
Q. Can you tell me a little bit about your educational background? Where did you go to school?
A. High school in Pawtucket, Rhode Island, Tolman High School.
Q. And I noticed you had a Navy hat on. Did you

serve in the military, sir?
A. Four years, Navy.
Q. Okay. And when was that?
A. '50 to '54.
Q. And are you presently employed, sir?
A. No.
Q. Okay. Are you retired?
A. Yes.
Q. Okay. How long have you been retired for?
A. Since '91.
Q. And what profession or job did you retire from?
A. I was the superintendent of the molding department at Hasbro Industries, Pawtucket.
Q. And how long did you work for Hasbro for, sir?
A. Almost 30 years, 29 and six months, something like that.
Q. And I take it that's the toy manufacturer?
A. Yes.
Q. And how long have you lived at the 4 Shore Garden Road address for?
A. Since 1986 full time. It's '96. I'm sorry. '96.
Q. So about five years after you retired?
A. Yeah.
Q. And how long have you owned -- let me ask you

this: Do you own that property, sir?
A. We took over ownership in '86. It was left to my wife and my brother-in-law and we bought him out in '86.
Q. Why don't you describe, if you could, your history of ownership of that property.
A. Well, my in-laws bought it. We were on vacation at -- across the street at the Lefkowit's (sic) home for two weeks in July in 1960, she saw that for rent sign on it, she inquired about it, and she's a very efficient and quick lady, she bought it in September.
Q. And what year was that?
A. That was in 1960.
Q. And when you're referring to your -- that's your mother-in-law?
A. Yes, Mrs. Johnson.
Q. What was her full name?
A. Margaret Johnson.
Q. And did she maintain continuous ownership until your wife and brother-in-law got it?
A. Yeah.
Q. Okay. And when was that again, sir?
A. '86.
Q. And during that time period, between 1960 and

1986, how frequently did you, yourself, go to the property?
A. Every weekend in the summertime.
Q. And did you ever go to the property in any seasons other than the summertime during those years, from '60 to '86?
A. In the fall, just to shut it down, check it out.
THE WITNESS: Oh, yeah.
Q. Did you want to clarify something, sir?
A. Well, we used it for vacation the first two weeks of July every year and she rented open weeks.
MR. CLOHERTY: Okay. Let me go over a couple of rules with you, too. I know your daughter is here accompanying you, but I'm going to ask that you testify, if you can, from your own memory as best you can. And, Cheryl, just advise you, you're not under oath here, so --
THE WITNESS: Leave me alone.
MR. CLOHERTY: He has to answer the questions from his own memory if possible. Okay?
MS. GRAYKO: Oh, okay.
Q. Now, you mentioned that you were there for usually two weeks in July for straight vacation

But from the beach, I've got the dunes in front of me, so I'd say I'm probably even.
Q. Okay. And you're not -- basically just to clarify, you're not on a hill looking down at the ocean, are you, sir?
A. Oh, no. No.
Q. Given the geography, have you ever had any experience with flooding or problems during tides?
A. Oh, yes.
Q. Can you describe some of the problems you've had in that area?
A. I've had flooding go all the way up my road under the house and all the way up to Atlantic Avenue about a foot-and-a-half high.
Q. And is there a basement in your home, sir?
A. No.
Q. Is your house on a slab?
A. No. It's -- what do you call it? It was stilts and I put cement blocks under it.
Q. Okay. So it used to be wooden stilts and now it's cement stilts?
A. Yeah.
Q. And how high are those stilts off the ground?
A. Maybe three feet.

Q. Have you ever had flooding where the water intruded into your living space?
A. No.
Q. And when you say you've had flooding in the past where it's been a foot-and-a-half high, is that -- how did you measure that or determined how high it was?
A. The bottom steps for my entrance.
Q. And did that flooding damage any property that you owned?
A. No.
Q. How about the cars or anything that you had?
A. No. I move my cars. If I'm notified in advance, you know, of high tides, astronomical high tide, I move my car to my neighbor's yard.
Q. Okay. And which neighbor?
A. Jeff Henry.
Q. And, why? Does he have a higher plot of land?
A. Yes. Yes. It's about two-and-a-half feet higher than me.
Q. And how frequently have flooding episodes like this occurred, sir, at your home?
MS. NOONAN: Objection.
A. I'd say, like, twice a year.
Q. And is that true during the entire time that

you've been going to that property?
A. I don't know because we never went down in the wintertime before. Since I've owned it, I'd say probably a half dozen times.
Q. And just to clarify that figure, since -- you've owned it since --
A. '95.
Q. Since '95?
A. Well, since I've lived there full-time, '95.
Q. And the flooding that you've just been describing occurring half a dozen times or twice a year, is that the flooding at a magnitude of a foot-and-a-half high?
A. Yeah.
Q. Have you ever had any lower flooding or regular occurring flooding?
A. Yeah, comes up to the back of the house.
Q. And how frequently does that occur?
A. Any abnormal high tide.
Q. Did you say "abnormal high tide"?
A. Abnormal, yes.
Q. During the winters since you've been living there full-time, have you stayed there through any blizzards or type of weather like that?
A. Storms, yeah.

A. Not really.
Q. Okay. Have you ever had any dealings with the Coastal Resource Management Counsel about wetlands on your property?
A. Not on my property, no.
Q. Okay. Have you had dealings with Coastal Resource Management Counsel about wetlands on other people's property?
A. Yes.
Q. Okay. How did that occur?
A. It's David Ciampi when he was building, they come down and they checked it. They checked the lot out. They had it flagged for wetlands, and then they didn't do much after that. They came back down a couple of times. Talked to him.
Q. And how do you know these people were from the CRMC?
A. She introduced herself.
Q. Do you remember who the person was?
A. Maureen. I can't right now.
Q. And Maureen from the CRMC, did you have any conversations with her about what she was doing?
MS. NOONAN: Objection.
A. Yes.
Q. What was that conversation?

A. She was checking --

MS. NOONAN: Objection.

A. -- on David Ciampi's property.

Q. And when you said the property was "flagged," what did you mean by that?

A. They showed where all the wetlands was.

Q. Did they actually put markers on the property?

A. Had red flags, yes.

Q. And where they put those markers, were you aware that before they put the markers there they were wetlands?

A. Had a good guess, yeah.

Q. Okay. And how long had the property been in the condition of wetlands?

MS. NOONAN: Objection.

A. Since I'd been going down there.

Q. And that's since the 1960's?

MS. NOONAN: Objection.

Q. In that area that had been flagged, as you described it, by the CRMC, had that area changed at all in the time that you'd been going there since the 1960's?

MS. NOONAN: Objection.

THE WITNESS: Has it changed?

MR. CLOHERTY: Yeah.

A. I don't think so, no.

Q. Okay. Have you noticed at one point in time it was not wetlands and then in the next year or two it had become wetlands?

MS. NOONAN: Objection.

A. No.

Q. Have you noticed any changes in the size of the wetlands, before it was smaller and had gotten bigger over time?

MS. NOONAN: Objection.

A. Since he put some fill in, yeah.

Q. Okay. What do you mean by that?

A. When he filled his land with stone, I think he came back a little bit too far toward the wetlands.

Q. And when you're saying "he" did that, you're referring to Mr. Ciampi?

A. Yeah.

Q. Do you remember when he had done that?

A. He started building that house three years ago, I believe, four years ago, three years ago.

Q. So before the time that Mr. Ciampi owned the property, had you ever noticed any change in the size of the wetlands on his property?

A. No.

tree. I don't know what a "shad tree" is. Just like a big, big bush that goes up about 15 feet or higher. Had all kinds of berry bushes, blackberry, raspberry.

Q. Any other distinguishing characteristics of that property other than the trees and bushes on it?

A. No. Just it was -- what do you call it -- a maple tree that my cousin took a seedling from home in Pawtucket and stuck it in the drainage ditch and it grew. That's been there since 1987.

Q. So it was your brother that planted the tree?

A. No, my cousin.

Q. Cousin?

A. Cousin.

Q. Okay. Now, you mentioned the drainage ditch, sir. Can you describe what you're referring to when you say "the drainage ditch"?

A. We get a buildup of water on Atlantic Avenue right there, right across here in front of the property, and every two -- inch-and-a-half, two inches of rain, it's about a foot deep. So somebody -- somebody opened up a drainage ditch into Turcos' property right towards my property.

Q. And do you know when that was first done?

A. I wasn't there in the wintertime or, you know,

at the time, so I can't say what time.
Q. Well, do you know how many years it had been in existence?
A. Close to -- had to be there in 1960, '61, '62.
Q. So you've known that drainage ditch to be in existence since as long as you've been dealing --
A. Yeah. Yeah.
Q. And do you know how wide of a drainage ditch that is, sir?
MS. NOONAN: Objection.
A. I'd say about three feet, maybe four feet.
Q. Do you know how long of a ditch it is?
MS. NOONAN: Objection.
A. The length of the property.
Q. And can you estimate the distance that is?
A. About 150 feet.
Q. And do you know if there's been any improvements made to that drainage ditch or anyone out there maintaining it or clearing it?
A. Clearing it. At one time, the town used to maintain it. Prior to that, I don't know if it was the state or the town.
Q. And what knowledge do you have of the town maintaining it?
A. Opening it up, cleaning it out.

Q. Now, before actually seeing anyone from the town opening up and cleaning it out, were you aware of that drainage ditch being in existence?
A. Yeah.
Q. Okay. Had you believed that the town had been --
A. I don't know who put it there. That's what I couldn't figure out.
Q. Okay. You've got to let me finish my question, too. Had you been aware of the town ever taking any other steps to clear out that drainage ditch before you actually saw them doing it?
A. No.
Q. Are there any other occasions when you saw town workers cleaning out that drainage ditch?
A. After that, yeah.
Q. Okay. How many times after that?
A. Always in the spring. They used to clean it out, cut the grass.
Q. When you say "cut the grass," what grass are you referring to?
A. Whatever's grown there.
Q. Would they clear the lot owned by Mr. Ciampi?
A. No. No. No.
Q. Just in the area of the ditch?
A. Just the ditch.

A. No. No.
Q. What was your earlier testimony about that being done every spring? What did that mean?
A. They used to cut the grass.
Q. Okay.
A. They used to come down and cut the grass to maintain that area. That's all, just maintain the area.
Q. Okay. So --
A. They'd check it out, they'd maintain the grass area and that's it.
Q. Okay. And did that happen every spring?
A. Not -- I couldn't say every spring, but maybe. They'd be down there often.
Q. And how long did that continue until, sir?
A. Just until he complained, Ciampi, three or four years ago.
Q. Okay. All right. Now, that drainage ditch on the property that we've been talking about, would you describe that as obvious to anyone who walked by it?
MS. NOONAN: Objection.
A. Oh, yeah.
Q. And was there anything hidden about it, sir?
MS. NOONAN: Objection.

A. No, just overgrown grass sometimes. That's why they maintained it, I guess.
Q. Until the Town cut the grass?
A. Yeah, let the water flow.
Q. Did you ever know Mr. McGrath to cut the grass in that area?
A. I don't know about him, no.
Q. How about the prior owners of that property, did they ever cut the grass there?
A. I've got no idea.
MR. CLOHERTY: I don't have anything further.
MS. NOONAN: Thank you.
MR. CLOHERTY: You're all done.
THE WITNESS: Thank you.
THE REPORTER: Would you like a copy?
MS. NOONAN: Yes, please. Could I have a mini?
(Off the record.)
MR. CLOHERTY: Back on the record. Mr. DuBreuil, I just want to place on the record that we discussed your right to review this transcript for accuracy and it's my understanding that you don't care to do so and you'll waive that right?
THE WITNESS: Right.