# EXHIBIT "J"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DAVID M. CIAMPI :
:
VS. : C.A. NO. 07-256-S
:
ETSUKO MOTOKI ZUCZEK, IN HER CAPACITY AS FINANCE DIRECTOR OF THE TOWN OF WESTERLY; PAUL CORINA, IN HIS CAPACITY AS SUPERINTENDENT OF WATER OF THE TOWN OF WESTERLY, AND PETER CHIARADIO, IN HIS CAPACITY AS SUPERINTENDENT OF PUBLIC WORKS OF THE TOWN OF WESTERLY :

DEPOSITION OF WAYNE PALUMBO, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Barbara Warner, RPR, Notary Public in and for the State of Rhode Island, at the Westerly Town Hall, 45 Broad Street, Westerly, RI, on July 23, 2008, at 1:25 P.M.

PRESENT:

FOR THE PLAINTIFF............ ADLER, POLLOCK & SHEEHAN
BY: ELIZABETH MCDONOUGH NOONAN, ESQUIRE

FOR THE DEFENDANT............ PIERCE, DAVIS & PERRITANO, LLP
BY: JOHN J. CLOHERTY, III, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND
401-946-5500

Q. Mr. Palumbo, are you currently employed?
A. Yes.
Q. By whom?
A. The Town of Westerly.
Q. What is your current position with the Town of Westerly?
A. Assistant superintendent, highway department.
Q. How long have you held that position?
A. Twelve years.
Q. Prior to that, were you also employed by the Town of Westerly?
A. Yes.
Q. What position did you have prior to being assistant superintendent of the highway department?
A. I was a laborer and moved up to a heavy equipment operator.
Q. When did you begin working for the town?
A. April 1978.
Q. Were you hired as a laborer in 1978?
A. Yes.
Q. Do you recall when you became a heavy equipment operator?
A. I became a light equipment operator

A. '72.
Q. I am going to show you what has been marked as Exhibit 1, which is a tax assessment map of the Town of Westerly.
A. Okay.
(EXHIBIT 1 MARKED FOR IDENTIFICATION)
Q. Have you had a chance to look at that?
A. Yes.
Q. You see that there is Atlantic Avenue and Shore Gardens Road; is that correct?
A. Yes.
Q. Are you familiar with that area of town?
A. Yes.
Q. Are you familiar with the property of David Ciampi, which is the subject matter of this lawsuit, specifically lot 65 on the corner of Atlantic and Shore Gardens?
A. Yes.
Q. When was the last time that you were out in this area?
A. I rode by there today.
Q. Is it fair to say that during all of the time you have been the assistant superintendent for highways that this area has suffered from flooding and drainage

problems?
A. Yes.
MR. CLOHERTY: The area of the roadway, or this particular parcel?
MS. NOONAN: The roadway.
THE WITNESS: Yes.
Q. Are you familiar specifically with lot 65?
A. That is his lot on the side?
Q. Yes.
A. Yes.
Q. Have you ever been on lot 65 in the course of your employment with the Town of Westerly?
A. Yes.
Q. Can you tell me about that?
A. When I first started out.
Q. What time frame?
A. In 1978. I know we would clean that trough out.
Q. I would like to show you what has been marked as Exhibit 2, which is a plan for lot 65, and I ask you if you can see on a portion of that Exhibit 2 where it says man-made drainage ditch on the left side of the property line; do you see that?

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

A. Yes, okay.

Q. And you see where it starts Atlantic Avenue on the property adjacent to Mr. Ciampi's, and then it goes on to Mr. Ciampi's property to the rear, where it says isolated coastal wetland; do you see that?

A. Yes.

Q. Is that consistent with your understanding of where this drainage ditch exists?

A. Yes.

Q. Back in 1978, if you recall, what did it look like?

A. I would say just like a little path. It was like a little trough.

Q. In 1978 you cleaned it out, how would you do that?

A. Just with shovels and a rubber hose.

Q. And what?

A. A rubber hose. It is like a pick, but with a square spade on the end. It is like a spade.

Q. Thank you. Subsequent to 1978, did you have any other occasions to be on the property identified as lot 65?

A. No.
Q. No?
A. You mean after '78.
Q. Yes.
A. Yes.
Q. Tell me about the next time you recall being out there, if you can?
A. It was usually scheduled like once a year during the summer months.
Q. Who would schedule that, if you know?
A. That would have been scheduled by my boss at that time, Mr. Anthony Chiaradio.
Q. Do you ever recall having discussions with any of the property owners of either lots 64 or 65 about the work that you were doing on the ditch there?
A. I'm not sure. Back then I did know the person who lived in the back on the left.
Q. But not --
A. I think he is deceased now. Not on the right side, no.
Q. In looking at Exhibit 1, are you speaking about perhaps the owner of lot 67 or lot 66?
A. Yes.

Q. But to the best of your knowledge, you never had any discussions with the owners of lot 64 or lot 65?

A. No.

Q. Now, when you became a light equipment operator in 1979, did you have an opportunity to go back out or to be at the site at all, if you recall?

A. Yes.

Q. What type of work would you do at that time?

A. The same.

Q. Same type of equipment?

A. Yes.

Q. Would you use any other, now being a light equipment operator, would you use any equipment on the property, aside from the shovels or spades that you previously described?

A. No.

Q. Do you recall the last time you were out on the property for maintenance purposes?

A. For maintenance, I would have to say I am not exactly sure, maybe '80, maybe the first three years I did that.

Q. Were you aware if other people subsequent to you continued to go on to the property to maintain it in the manner you have described?

A. Yes.

Q. How are you aware of that?

A. I know it was scheduled every year because they have a crew.

Q. How long did that scheduling go on, do you know?

A. I want to say as recent as maybe 2000.

Q. Do you know why it ceased?

MR. CLOHERTY: Objection. You can answer.

A. No.

Q. Did anyone ever tell you not to undertake the maintenance on lot 64 and lot 65?

A. No.

Q. To your knowledge, was any equipment, aside from shovels or spades, used to maintain the ditch on lot 64 and lot 65, if you know?

A. No.

MR. CLOHERTY: No, you don't know, or no, there wasn't any?

THE WITNESS: No, we never used any heavy equipment.

Q. Any mechanical equipment at all?

A. No.

Q. During the time when you did not actually have to go out there and do the work, but other people did, did you have an opportunity to observe the ditch?

A. Yes.

Q. Did you notice a change in the ditch over the time from when you first started working on it until 2000?

A. It was basically the same, the same runoff.

Q. As part of the maintenance, would they cut back brush?

A. Yes. If it was obstructing, yes.

Q. When you say it was scheduled, was it a written schedule or something that was done?

A. It is on a schedule. We have a list.

Q. There is a list?

A. Yes.

Q. Who would have that list, if you know?

A. Myself.

exactly. I want to say when Mr. Antorch retired, but I am not sure.

Q. I don't want to drag you back to ask you about the list, do you have in your mind what your list looks like that talks about the schedule of maintenance?

A. It is just a list of waterways and troughs we maintain throughout the town.

Q. Can you list some of those for me that the town maintains? Let me change that. Are any of those waterways and troughs located on private property, that you know of?

A. No.

Q. Were you aware that the one on lots 64 and 65 was on private property?

A. No.

Q. When you were doing the work yourself in 1978 to the early '80s, you were not aware that was private property; is that correct?

A. Correct.

Q. What did you understand that property to be?

A. Back then there was nothing there. I don't know if the town had an easement. I didn't know back then.

Q. You were not concerning yourself with that at that point?

A. Right.

Q. In terms of the list that you have that has waterways and troughs on it, have you ever reviewed that list to determine whether or not any of those properties are private properties or any -- strike that. Is the location of any of those waterways or troughs on private property?

A. No.

Q. No one has ever asked you, aside from counsel, to take a look at that list and determine whether or not any of those were on private property?

A. No.

Q. I will show you what has been marked as Exhibit 3, Mr. Palumbo, and I ask you if you recognize that.

(EXHIBIT 3 MARKED FOR IDENTIFICATION)

(WITNESS PERUSES DOCUMENT)

A. No.

MR. CLOHERTY: He looked at this first page, do you want him to look through everything?

A. Not yet, no.

Q. Do you know when it is expected to go on line?

A. No.

Q. At this time, there is no plan to do a similar type of pump at this area of Atlantic Avenue by Shore Gardens?

A. Not that I am aware of.

Q. Do you have any knowledge of a waterline that crosses lot 65 that services lot 67 and lot 66?

A. No.

Q. Does the town continue to maintain or schedule maintenance for the waterways and troughs that you have described on your list?

A. Yes.

Q. Any idea how many at this time?

A. I don't know.

Q. To your knowledge, have there ever been any CRMC or DEM violations issued in relation to the town's maintenance work, as you have described, on these waterways and troughs?

A. No.

Atlantic Avenue; do you recall that
testimony?
A. Yes.
Q. And you mentioned any tools used would have
been shovels or spades; is that correct?
A. Yes.
Q. What did the maintenance work consistent
of, can you describe it? Was it digging
the ditch?
MS. NOONAN: Objection.
A. It was like all sediment from the
runoff. It would build up, and the more
flooding on the road, so we would go in and
make sure the water would run.
Q. As a result of the maintenance work, was
there any alteration of the depth or the
width of the drainage ditch?
A. No. It was kept the same.
Q. Did the depth or width of the drainage
change at all, to your knowledge, from when
you first started in 1978 until you were
last at that property in 2000 or so?
A. No.
Q. Do you know how that drainage ditch at lot
64 and lot 65 came to be in existence in

the first place?

MS. NOONAN: Objection.

A. No.

MR. CLOHERTY: I have nothing further.

RE-EXAMINATION BY MS. NOONAN

Q. You indicated when you went out to the property back in 1978 to the '80s, you assumed it was town land; is that correct?

A. Yes.

Q. So subsequently you never sought permission of the owners of lot 64 or lot 65 to do the work?

A. No.

MS. NOONAN: I have nothing further.

RE-EXAMINATION BY MR. CLOHERTY

Q. Was there any, back at that time, were there any buildings or structures on that land at lots 64 or 65?

A. That is the right side.

Q. On lot 65, let's say?

A. No.

Q. What was present on that land?

A. Just grass.