# EXHIBIT "R"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DAVID M. CIAMPI :
:
VS. : C.A. NO. 07-256-S
:
ETSUKO MOTOKI ZUCZEK, in her capacity as Finance Director of the Town of Westerly; PAUL CORINA, in his capacity as Superintendent of Water of the Town of Westerly, and PAUL CHIARADIO, in his capacity as Superintendent of Public Works of the Town of Westerly :

DEPOSITION OF PAUL CORINA, a Defendant in the above-entitled cause, taken on behalf of the Plaintiff, before Ronald M. Ronzio, a Notary Public in and for the State of Rhode Island, at the Town Offices of the Town of Westerly, 45 Broad Street, Westerly, Rhode Island on April 29, 2008 at 1:00 PM.

PRESENT:

FOR THE PLAINTIFF . . ADLER POLLOCK & SHEEHAN, P.C.
BY: ELIZABETH MC DONOUGH NOONAN, ESQUIRE

FOR THE DEFENDANT . . PIERCE, DAVIS & PERRITANO, LLP
90 Canal Street
Boston, MA 02114-2018
BY: JOHN J. CLOHERTY, III, ESQUIRE

(DEPOSITION COMMENCED AT 1:02 PM)

PAUL CORINA

Being duly sworn, deposes and testifies as follows:

THE REPORTER: Would you state your name and spell your last name.

THE WITNESS: Paul Corina, C-O-R-I-N-A.

EXAMINATION BY MS. NOONAN

Q. Mr. Corina, where do you reside?
A. 9 Hillside Terrace in Westerly, Rhode Island.
Q. How long have you resided there?
A. 34 years.
Q. By whom are you employed?
A. Town of Westerly.
Q. How long have you been employed there?
A. 34 years.
Q. Prior to working for the town, what was your educational background?
A. High school graduate.
Q. From where?
A. Westerly High School, and took college courses in surveying, things like that, Thames Valley Technical College, Connecticut.
Q. What's your current position with the town?
A. Superintendent of utilities.

Q. Can you tell me what that entails?
A. It's the supervision and control over the water distribution, water pumping, production, potable water, also the handling of the sewer collection system in the Town of Westerly.
Q. Is there a private water district in the Town of Westerly?
A. No.
Q. Is there a private fire department?
A. There are some houses that have wells, very few.
Q. But there's no private water district, okay. So, everything in the Town of Westerly, if it's serviced by water service, it would be the Town of Westerly water service, correct?
A. Yes.
Q. How long have you been superintendent of utilities?
A. Since 1986.
Q. And is it part of a larger department?
A. It's a part of the Department of Public Works. There used to be a director that they ended up splitting and making three individual departments. Basically, it's a stand-alone department now, utilities.

come off the line going to your property,"
correct?
A. Yes.
Q. Turning to Page 2 of Exhibit 1, is that -- are those the service cards that you referred to?
A. Yes.
Q. How did you go about locating these specific documents?
A. We have a card system on every water service, and we looked up the records and pulled them out and made copies.
Q. And on Page 3 of Exhibit 1, can you tell me where you located this document?
A. This was in one of our field books, records of water mains, water lines that are put in.
Q. What type of -- can you describe what that book looks like?
A. It's the size of this paper.
Q. Okay.
A. Probably a hundred pages. It's an engineering book, called a field book.
Q. This has a page reference of 101 on it. How many pages do you think approximately this field book is?
A. Maybe 150.

Q. And how are they organized, the field books, generally?
A. They're organized by date of installation or date of when it was put in.
Q. Okay. Fair to say they're not organized by year, but it would start at a certain point until you filled up the book and then another book would be started?
A. That's correct.
Q. Do you know how far back these books go for the Town of Westerly?
A. Since the beginning of the system.
Q. But you were able to locate for a system that was installed in approximately the '50's, correct?
A. Yes.
Q. Aside from, I guess we call these the card system, service cards, and the notes from the field book, would there be any other documentation in the water department that would reference the installation of this water line that's referenced in Exhibit 1?
A. No.
Q. You've been with the water department since what, 1974, you said?
A. Yes.

public road, say, in this case, would apply to Atlantic Avenue, but not to anything that traversed private property; is that correct?
A. That's correct.
Q. So, when you get a request for a hookup, let's just talk about presently, what, if anything, would your department do in the case of a hookup off of a line in a public road for private use?
A. We would require paperwork to be filled out and charges. We get certain charges up front, called right-of-entry for anybody that hooks into the system, certain dollar amount, and then we would instruct the property owner to run their service line to the property line and into the basement. And where would be -- if it would be a water service that it would be hooked up on an existing service that was laid out for that lot previously, they would just hook it up. If it's not there, with the payment of the fees, the town would put the water service to their property line, connect their pipe.
Q. So, in that case, the town would provide the service off of the main line to the property owner's property and then they would pick up the installation from there?

MR. CLOHERTY: Objection.
A. Yes.
Q. That process you just described for me, is that written down anywhere, if it is?
A. I don't think so.
Q. Do you recall if it was ever written down in your time with the department?
A. No.
Q. The paperwork that you described, what does that entail if I were a homeowner that wanted to come in and hook up to the town's public line?
MR. CLOHERTY: Today's paperwork --
MS. NOONAN: Yes.
A. It's a form with general information on ownership of the property and address and phone numbers, what size line they would like to have, and pretty much that's it. There's a water service card that they sign, just agreeing to our, I believe, payment when we supply water type thing.
Q. How long has that form been in existence?
A. The form for the service location card has been in existence a long time. I don't know -- I don't know if there's been any language changes or anything, but it's been there since before my

copies, the poor copies, very dark copies.
Q. We'll get to those. That was going to be one of my questions, what those were. Okay. You testified in speaking about the, I believe, the application -- strike that. You talked about a form with general information on ownership of the property, size of the line, and water service card, correct?
A. Yes.
Q. Is that the application or the service location card? I just want to be clear so we're talking about the right thing.
MR. CLOHERTY: Objection.
A. The service location card is these cards.
MR. CLOHERTY: He's pointing to Exhibit 1, Page 2.
Q. In that you talk about, in your answer, you talk about general information on ownership. Why is that important?
A. Well, for future billing of the property, we need to know who the account has to be set up with, information relative to that.
Q. Currently, after a water line is installed off of a public line under private property, what, if any inspection, does the water department conduct?

A. We don't do any inspection on private property.

Q. Would you do an inspection on any portion of public property after you had created a new connection?

THE WITNESS: As part of the installation of the service lateral from the water main?

MS. NOONAN: Yes.

A. We do that ourselves with our own people.

Q. So, you would inspect from the existing public line to the lateral that went, then, to the property if the owner had requested the connection, correct?

MR. CLOHERTY: Objection.

A. We install it. We don't inspect our own work.

Q. That's my question. How, in the real world today, again, if I went in to get a connection off a public line, let's say, Atlantic Avenue, to a new connection --

MR. CLOHERTY: By public line, you mean water main?

MS. NOONAN: Yes.

Q. -- onto private property, and what would the town's role physically be in any installation and

inspection of that line?

THE WITNESS: From the water main to the property line?

MS. NOONAN: Correct.

A. It depends on a couple of different things. If the water main was installed previously with future use service lateral connections, the town wouldn't do anything because the developer would come, he would hook right to that connection because it would be at the property line. He would do everything. If there was a no set up for future use connection as we call it, the town would come in and put the installation in to the property line for the water main to the property line.

Q. Do you have any records indicating what may have occurred at the time that the service line was installed that's referenced as part of Exhibit 1, in terms of the town's physical involvement on the site?

THE WITNESS: As part of this, you're saying?

MS. NOONAN: Yes.

A. I don't know anything about the top one. The bottom one, the only reason I know about this,

this is my writing, is because this eight-inch line was put in, replaced and -- the line to the property line was replaced. So, I made up this new card myself showing the new equipment that was installed on a public right-of-way.

MR. CLOHERTY: Just so the record is clear, the witness was pointing to Page 2 of Exhibit Number 1, and I think the bottom card is the one where he was writing it on.

MS. NOONAN: Can you mark that.

(PLAINTIFF'S EXHIBIT 2 MARKED FOR IDENTIFICATION)

Q. Mr. Corina, I want to show you what's been marked as Plaintiff's 2 in this matter, and ask if you're familiar with that document.

(WITNESS REVIEWS DOCUMENT)

A. Yes.

Q. Tell us what that is.

A. It's the front and the rear of two service cards, one for 484 1/2 Atlantic Avenue and one for 4 Shore Gardens Road.

Q. On Page 1 of Exhibit 2, starting with the top document that is very blackened, can you tell me what that is?

A. Service location card for 484 1/2 Atlantic

Avenue.

Q. Do you know if there was a date on that?

A. It's in the '50's. I can't read it good.

Q. Would that be on the bottom left --

A. Yes.

Q. -- of Exhibit 2 on the first page? This document is illegible as it was provided to us in response to request for production. Where does the original exist?

A. At our facility.

Q. Is it there now?

A. Yes.

MS. NOONAN: Would you be willing to make that available --

MR. CLOHERTY: Yes, or certainly we'll try to get you a better copy as well.

Q. That's illegible, from our view. Now, on Page 1 of Exhibit 2, there is a copy of the card below that is legible, correct?

A. Yes.

Q. And what does that reference?

A. The service location card for 4 Shore Gardens Road.

Q. There's no date on that, is there?

A. No.

in and a 2-inch copper to the property line, do
you know if there were any changes in the water
line into the private property?
A. I'm not aware of any.
Q. Did you notify homeowners at all that this work
was being done?
A. I don't remember.
Q. Just so I'm clear here, in comparing Plaintiff's
1, Page 2, and the cards on there, do those match
up to any of the cards on Page 2 of Exhibit 2?
A. The top one on Exhibit 2 compares to the
bottom one on Exhibit 1.
Q. And do you know --
A. The other one looks like this one. Can't be
sure.
Q. So, the 4 Shore Gardens Road one that's blackened
on Plaintiff's 2 looks like the one on Page 2 of
Exhibit 1?
A. They seem to be the same one, yes.
Q. Currently, as part of the town's approval of water
lines, does it ever request or determine if the
lines are appropriately crossing or appropriately
on people's property?
MR. CLOHERTY: Objection.
A. We have a rule that we don't -- there's

nothing written down as far as anything like going to do an inspection or land survey. We're not land surveyors. There's a general rule that water mains are supposed to be on their own property. I mean water services, we don't check.
Q. So it would be the custom and practice of the water department that water mains be on the people's property --
A. Water services, I'm sorry.
Q. And is it your custom and practice to verify that in any way?
A. No.
Q. Do you ever recall an instance where you found out that a water service was on someone else's property?
A. I believe it's happened before.
Q. Can you tell me about those.
A. I'm not aware -- I've heard of it happening. Somebody might have had a water line on somebody else's property.
Q. In your capacity as superintendent of utilities, has that come to your attention?
A. I know one other case.
Q. Where was that?
A. It was on Oak Street in Westerly, Rhode

conversations with either town managers?
A. No.
Q. Is your water department ever involved with getting easements for water line installations?
A. No. The -- well, the only type of easements we would get is if it was a water main that we would be taking over, very seldom. This has happened in the past.
Q. In the case that we had talked about, an installation today of a water main with a lateral coming off of it onto private property, if something happens to that water line on the private property, whose responsibility is it to repair?
A. The property owner.
Q. Has the town ever, in your knowledge or experience, undertaken repairs of a water line on a private property?
A. Not to my knowledge. The only thing is I want to just clarify one thing. Private property, the only thing we do is public right-of-way, which possibly is a water main that is like -- it's odd. We don't own the road, but it's public right-of-way that we do maintain, but nothing on private property, per se.

to get some type of easement through the front lot
and install the water line to a public
right-of-way.
Q. Would you require that as part of the
installation?
MR. CLOHERTY: Objection.
A. Yes.
Q. In this case, Mr. Ciampi owns Lot 65. And are you
aware that the water line that we've been
discussing crosses Mr. Ciampi's property and
services Lots 66 and 67?
A. Yes.
Q. And are you aware that there is no easement in
place for the crossing of Mr. Ciampi's property to
service Lots 66 and 67?
MR. CLOHERTY: Objection.
Q. Are you aware of that?
A. I never researched to see if there was one
there.
Q. But you're saying that if, today, there was a
connection to be required -- someone requested a
connection in the case of Lot 67, it would require
an easement across Lot 66 in order to tie in on
Shore Gardens Road, correct?
A. Yes, between the two properties.

Q. Is it fair to say that you would not -- the water department would not allow the connection for Lot 67 unless an easement was in place with the owner of Lot 66?
MR. CLOHERTY: Objection.
A. In today's time, yes, we do not.
Q. Has that been your -- how long would you say that that's sort of been the practice of the water department based on your experience in the time you've been there?
A. Since before my time it has.
Q. Do you know how long before your time?
A. No. I know it was that way when I got there.
Q. In 1974?
A. Yes.
Q. During your tenure at the water department, if someone did not obtain that easement, what would the water department do?
MR. CLOHERTY: Objection.
A. Refuse service.
Q. I know I asked you about your interrelationship with the, I guess the engineering and the highway departments, correct?
A. Yes.
Q. Do you -- or to what extent does the water